(No. 44627.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. STUART COLE, Appellee.

*Opinion filed June 4, 1973.*

SCHAEFER and WARD, JJ., dissenting.

WILLIAM J. SCOTT, Attorney General, of Springfield, and RICHARD A. HOLLIS, State's Attorney, of Springfield (JAMES B. ZAGEL and MELBOURNE A. NOEL, JR., Assistant Attorneys General, of counsel), for the People.

BRUCE L. HERR, of Illinois Defender Project, of Springfield, for appellee.

HARRY G. FINS, of Chicago, for *amicus curiae.*

MR. JUSTICE RYAN delivered the opinion of the court:

Following a jury trial in the circuit court of Sangamon County, defendant, Stuart Cole, was convicted of murder and sentenced to a term of from 50 to 75 years in the penitentiary. This judgment was reversed by the Appellate Court for the Fourth District, which held that defendant was unconstitutionally denied his right to a jury trial by an impartial jury. (132 Ill. App. 2d 1041.) We allowed the State's petition for leave to appeal.

The defendant's first contention is that the State has no right to petition for leave to appeal from the appellate

court's decision under our Rule 315 (50 Ill.2d R. 315). We do not agree with this contention. In *People v. Perry, 52 Ill.2d 156,* this court has recently recognized the right of the State to petition for leave to appeal from an adverse decision of the appellate court. Also, Rule 315(a) and Rule 604(a) have been amended effective November 30, 1972, specifically authorizing the State to petition for leave to appeal in such cases. 52 Ill.2d R. 315(a), R. 604(a).

On the morning of April 28, 1967, a freshly dug grave containing the mutilated remains of two men, subsequently identified as Merle Hornstein and Bill Worthington, was discovered southwest of Springfield. Interviews with persons acquainted with the deceased men, as well as a gravesite investigation, led police to believe that probable cause existed to arrest the defendant for the murders. On the afternoon of the 28th, at approximately 1:30, police proceeded to the defendant's residence, a former railroad blockhouse, where defendant was arrested. No evidence was seized at the time of arrest, but about one and one-half hours later at approximately 3 P.M., after the defendant had been taken from his home, evidence was taken from the defendant's residence without a search warrant by the officer in charge of preserving and cataloguing the evidence. Following the defendant's arrest another officer had been stationed at the premises until the investigating officer arrived.

The appellate court held that the taking of the evidence from the defendant's residence after he had been arrested and removed to the police station violated his rights under the fourth amendment to the Federal constitution. It held that the admission into evidence of the items taken, however, was harmless error. The evidence of the defendant's guilt aside from the evidence taken without a search warrant is indeed overwhelming.

One of the victims, Merle Hornstein, and another party owned the railroad blockhouse where the defendant lived. On April 27, 1967, at about 1 P.M., Hornstein and

Bill Worthington left Hornstein's home in Springfield. They were driving Hornstein's red El Camino Chevrolet pickup truck. Hornstein was known to have had several hundred dollars in currency with him. At about 1:10 P.M. he stopped at a business establishment and asked a friend to accompany them to the blockhouse. The friend declined and Hornstein and Worthington drove off in the direction of the defendant's home. The red El Camino truck was seen parked at the blockhouse by several neighbors between 2 P.M. and 6 P.M. At that time the truck was empty. Two neighbors testified that during the afternoon two shots were heard. The sounds came from the direction of the blockhouse. About 6 P.M. the truck was seen leaving. At that time it contained boxes and bags.

About 7 P.M. the defendant purchased a flashlight, batteries, some rope and a long-handled tool at a local hardware store. The check-out lady was acquainted with the defendant and noticed that he was carrying a large sum of money in his money pouch. That evening he was seen driving the truck turning off the road which led to the vicinity of the gravesite onto a State highway. At 3:40 A.M. on April 28 the truck was found burning along the highway and a rifle which belonged to the defendant was found in the cab of the truck. Later that morning the defendant was seen walking along the railroad tracks toward Springfield.

A card addressed to the defendant was found near the gravesite and ballistic evidence indicated that metal fragments found in the dismembered bodies had been fired from the defendant's gun. Tire prints found near the gravesite were identified as having been made by the truck. When the police and the sheriff went to the blockhouse to arrest the defendant, they saw blood on the floor at the entrance to the building. The officers broke open the door and arrested the defendant on the roof of the building. At that time he was armed with a loaded .45-caliber automatic and a 12-gauge shotgun.

Items which were taken from the defendant's home and introduced into evidence were an ax, a broom, a five-gallon bucket, a sales slip, some sand, some soil and two small boards. Tests revealed the presence of human blood on each of these items. Also taken from the defendant's home and introduced into evidence were a small amount of substance believed to be human flesh and a piece of paper similar to paper found at the gravesite.

In light of the overwhelming evidence of guilt the appellate court properly held that any error committed in the introduction of these items into evidence was harmless error beyond a reasonable doubt. (*Fahy v. Connecticut, 375 U.S. 85, 11 Ill. Ed. 2d 171, 84 S. Ct. 229; Chapman v. California, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; Harrington v. California, 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726; Schneble v. Florida, 405 U.S. 27, 31 L. Ed. 2d 340, 92 S. Ct. 1056.*) However, for the reason stated later, this case must be remanded to the appellate court for consideration of other issues. We must therefore review the propriety of the appellate court's holding that the warrantless search and seizure violated the defendant's fourth-amendment rights as a guide to the trial court in the event a retrial is necessary.

The search and seizure in this case occurred before the decision of the United States Supreme Court in *Chimel v. California (June 23, 1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034.* The decision in *Chimel* does not apply to searches conducted prior to that decision. (*Williams v. United States, 401 U.S. 646, 28 L. Ed. 2d 388, 91 S. Ct. 1148.*) Therefore, the validity of the search and seizure incident to the arrest in this case must be judged by pre-*Chimel* standards.

The defendant contends that after he was arrested and taken to the jail, the officers could have procured a search warrant before conducting a search of his residence. The test relating to a warrantless search prior to *Chimel* was not whether a warrant could have been secured but

whether the search without a warrant was reasonable. (*United States v. Rabinowitz, 339 U.S. 56, 94 L. Ed. 653, 70 S. Ct. 430; People v. Hanna, 42 Ill. 2d 323;* see also *People v. Pickett, 39 Ill. 2d 88; People v. Brown, 38 Ill. 2d 353; People v. Harris, 34 Ill. 2d 282; People v. Jones, 31 Ill. 2d 240; People v. DiGerlando, 30 Ill. 2d 544; People v. Watkins, 19 Ill. 2d 11.*) "That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case." (339 U.S. at 66, 94 L. Ed. at 660.) We therefore find no merit in the defendant's contention that the search was invalid because it would have been practical for the officers to obtain a search warrant.

In determining the reasonableness of the search "The critical issue in each case must be whether the situation that confronted the officer[s] justified the search. \*\*\* Other courts are in accord. They \*\*\* have examined the nature of the offense and the surrounding circumstances to determine whether the search was warranted. [Citations.]" (*People v. Watkins, 19 Ill. 2d at 18.*) In the present case in determining the validity of the search and seizure "it is the reasonableness of the search \*\*\* which is of primary importance and not whether the search occurred before or after the defendant was arrested and taken into custody." *People v. Pickett, 39 Ill. 2d at 93.*

No question is raised about the legality of the arrest without a warrant. The officers went to the defendant's residence (the old railroad blockhouse) for the purpose of arresting the defendant for the commission of a heinous crime. The door was locked and blood stains were plainly visible on the steps. The defendant was seen on the roof and the officers forced the door open and entered. The sheriff, two deputies and one or two State police officers entered the building at that time. The interior of the building consisted of one room; part of the floor was composed of sand and dirt. There was a large skylight in the ceiling and a ladder had been placed through the skylight to the roof. One of the officers went up the

ladder, disarmed the defendant and brought him back down into the room where he was handcuffed. During this interval, other officers arrived. A short time before the defendant was taken from the premises, Deputy Revell arrived and took charge of the premises. About four or five minutes after the defendant had been taken to the jail, Revell entered the building. He testified that he did not at that time seize any of the items of evidence from the exterior or the interior of the building because he was waiting for Lt. Pickett, the chief investigating officer, to arrive from the gravesite so that the evidence could be properly inventoried. He also stated that all of the items subsequently seized were visible to him when he first entered the room, even the blood-stained sand, a sample of which he and Pickett later took and inventoried. While gathering the evidence, Pickett did not search into any drawers or closets, and all items that were taken were in open view in the room.

The blood on the doorstep and the general appearance of the interior of the building gave rise to probable cause to believe that evidence of the crime would be found on the premises. If the search of the room and the seizure of the items had been conducted prior to the defendant's departure, under the pre-*Chimel* rule, there would be no question that the search was incident to a lawful arrest. (*United States v. Rabinowitz.*) The issue in this case is created by the fact that the items of evidence were seized after the defendant had been taken into custody and had departed from the premises.

A search may be incident to a lawful arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity thereof. (*Stoner v. California, 376. U.S. 483, 11 L. Ed. 2d 856, 84 S. Ct. 889; People v. Jeffries, 31 Ill.2d 597.*) However, pre-*Chimel* searches have been upheld as incident to an arrest, although conducted a considerable length of time after the arrest and conducted out of the presence of the defendant.

In *Harris v. United States, 331 U.S. 145, 91 L. Ed. 1399, 67 S. Ct. 1098,* the defendant was arrested in the living room of his four-room apartment. One Federal Bureau of Investigation agent was assigned to each room and a thorough search was conducted of the entire apartment lasting approximately five hours. Toward the end of the search one of the agents found in a bedroom bureau drawer an envelope containing the evidence sought to be suppressed. The court held the search to be incident to the arrest and the evidence properly seized. Also in *Warden v. Hayden, 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642,* officers who had reason to believe that a person who had committed a robbery was in a house entered the house to search for him. They spread out through the first and second floors and the basement. The defendant was found and arrested in an upstairs bedroom. An officer continuing his search in the basement found in a washing machine some clothing which matched the description of that worn by the robber. The court sustained the search and seizure as incident to the arrest. Thus, a seizure five hours after the arrest was not unreasonable and a seizure of items of evidence from the basement while the defendant was in the bedroom of the second floor was not unreasonable. The seizure in this case more closely followed the arrest than in *Harris v. United States* and as in *Warden v. Hayden* was made out of the presence of the defendant. No set formula as to the time between arrest and seizure or as to whether the search is conducted in or out of the physical presence of the defendant can be controlling in determining whether the search is unreasonable. Reasonableness must be determined under the facts and circumstances peculiar to each case.

We are of the opinion that the seizure of the evidence in this case without a search warrant was not unreasonable. Under the circumstances "the exigencies of the situation" justified the procedures followed. (*Warden v. Hayden; McDonald v. United States, 335 U.S. 451, 456, 93 L. Ed.*

*153, 158, 69 S. Ct. 191.*) The seizure was substantially contemporaneous with the arrest. Deputy Revell was on the premises while the defendant was still present. He was placed in charge of the premises. After first looking around outside he entered the building a few minutes after the defendant had been taken away. All of the items of evidence were in plain view at that time and were in his custody. The actual taking and removal of the items was delayed so that they could be properly inventoried and identified after the arrival of the chief investigating officer. The search was incident to a lawful arrest and did not violate the defendant's fourth-amendment rights.

For a collection of cases relating to warrantless searches incident to an arrest following a removal of the defendant from the premises, see an annotation in 19 A.L.R.3d at 785. It is interesting to note that some of the decisions conform to the decision in this case and some of the decisions are contrary thereto. It is evident that the factual situation in each case has dictated the result. Also, we point out that the holding in this case is not contrary to the previous decision of this court in *People v. Kalpak, 10 Ill.2d 411.* The factual differences in the two cases warrant the different results.

A violent, heinous crime had been committed. Through diligent investigative efforts the trail of evidence led the officers to the defendant's home where he was seized, disarmed and handcuffed. The fact that the chief investigating officer did not complete his work at the grave-site in time to arrive at the home before the defendant was removed to the jail did not, under these circumstances, interrupt the sequence of events to the extent that this officer's later gathering of evidence constituted a search separate and distinct from the arrest. We must judge the event not in terms of legal niceties but in light of the factual circumstances and exigencies which actually confronted the officers. Viewing it in this manner we must conclude that the arrest and the search and the seizure

were parts of one continuing episode, each sequence of which followed as a natural continuation of the others.

The appellate court based its reversal on the trial court's refusal to allow the defendant's challenge of a juror for cause. The defendant contends, and the appellate court found, that this denial abridged the defendant's constitutional right to a trial by a fair and impartial jury. This issue cannot be disposed of by the harmless-error rule discussed above. The right to a trial by an impartial tribunal is so basic that a violation of the right requires a reversal. (*Chapman v. California, 386 U.S. 18; Tumey v. Ohio, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437.*) The right to a jury trial guarantees to one accused of a crime a fair trial by a panel of impartial jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *Turner v. Louisiana, 379 U.S. 466, 471-472, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546.*

At the time of the *voir dire* examination of Russell Davis, a Springfield businessman, the defense had exhausted its 20 peremptory challenges. During examination by the court, Davis disclosed that he had had certain contacts with some of the trial participants. He knew both the State's Attorney and assistant State's Attorney. He had talked to one of the deceased men, Merle Hornstein, approximately one year prior to the trial concerning the possibility of buying a pool table from him. He knew Dr. Fleischli, a witness for the State, who used to live next door to him and had been his family physician. Alfred Hurrelbrink, a witness for the State, had a sister who was married to Davis's son. He was also a friend of Sheriff Edward Ryan.

When asked by the court if his acquaintanceship with either the State's Attorney or assistant State's Attorney would influence his decision in this case, Davis replied, "I'm human like everybody else, but I would generally— no." Responding to the court's inquiry of whether his conversation with Hornstein concerning the pool table

would influence him, Davis unequivocally stated, "No." Concerning his acquaintanceship with Dr. Fleischli, Davis explained that he had not resided next door to the doctor for 20 years, and that the doctor was no longer his family physician. In concluding its examination, the court inquired of Davis whether he could give the testimony of witnesses with whom he was not acquainted the same weight as that given the testimony of those witnesses with whom he was acquainted. Davis replied, "I would be man enough to do that, yes." He stated that he had no opinion as to the guilt of the defendant.

When examined by the State, Davis reiterated that he would not allow prior associations with either the State's Attorney or assistant State's Attorney to interfere with his duties as a juror, and that if selected he would render a fair and impartial verdict. Concerning conversations with the sheriff, during which the murders were mentioned, Davis related that the sheriff had not told him anything that had not been covered by news stories. In response to an inquiry as to whether he could disregard anything that might have been said outside the courtroom and base his verdict solely on the evidence presented at court, Davis replied, "I believe I could, yes."

At the conclusion of the State's examination, the defendant challenged Davis for cause. The challenge was denied, and the defense then examined him. Davis once again reiterated that his associations with the State's Attorney, assistant State's Attorney, Hurrelbrink, Hornstein, and Sheriff Ryan would not influence his decision. He stated that he had recently served as treasurer of the campaign fund for the sheriff. In addition, he indicated that he had had no contact with the witness Hurrelbrink for three to four years. Concluding the examination, he again stated that he would not give the testimony of these witnesses any more weight than that of any other witness. Following examination by the defense counsel, the challenge for cause was not renewed.

During the questioning, Davis also revealed that his wife was a deputy for the Board of Review and knew defense counsel and had often assisted him with matters before the Board.

At common law a juror was presumed to be biased and therefore disqualified if he was related to a party to the litigation through blood or sanguinity or through certain indirect personal relationships. Our statute (Ill. Rev. Stat. 1967, ch. 78, par. 14), like the statutes of many States, has not enumerated the common-law disqualifications in setting forth causes for challenge. However, there are certain relationships which may exist between a juror and a party to the litigation which are so direct that a juror possessing the same will be presumed to be biased and therefore disqualified. In such a case it is not necessary to establish that bias or partiality actually exists. We are not concerned with these disqualifications in this case and deem it unnecessary to specify them here. For a general discussion on the subject, see 50 C.J.S. Juries, secs. 208-225; 47 Am. Jur. 2d Jury, secs. 265, 266, 313-338.

Beyond these situations which raise a presumption of partiality, a person is not competent to sit as a juror if his state of mind is such that with him as a member of the jury a party will not receive a fair and impartial trial. "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." *United States v. Wood, 299 U.S. 123, 145-146, 81 L. Ed. 78, 88, 57 S. Ct. 177.*

The burden of showing that the juror possesses a disqualifying state of mind is on the party challenging the juror. "Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside. *** If a positive and decided opinion had been formed, he would have been incompetent even though it

had not been expressed." *Reynolds v. United States, 98 U.S. 145, 157, 25 L. Ed. 244, 247; Irvin v. Dowd, 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639.*

The determination of whether or not the prospective juror possesses the state of mind which will enable him to give to an accused a fair and impartial trial rests in the sound discretion of the trial judge. His determination should not be set aside unless it is against the manifest weight of the evidence. *People v. Harris, 38 Ill.2d 552, 556; Reynolds v. United States, 98 U.S. 145, 159, 25 L. Ed. 244, 248; Holt v. United States, 218 U.S. 245, 248, 54 L. Ed. 1021, 1028, 31 S. Ct. 2; Irving v. Dowd, 366 U.S. 717, 723-724, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639.*

The determination of impartiality is not purely an objective determination, as the opinion of the appellate court indicates. The statement of the juror is proper for the court to consider as evidence of his state of mind to be given the weight to which it is entitled under the circumstances. (*Coughlin v. People, 144 Ill. 140, 181.*) If the juror has previously expressed a fixed opinion as to the defendant's guilt, of course, his statement on *voir dire* examination that he can give the accused a fair and impartial trial must be judged in light of the opinion which he previously expressed. *People v. Ortiz, 320 Ill. 205, 212; People v. Cravens, 375 Ill. 495, 497.*

In our case Davis stated he had no opinion as to the defendant's guilt. He stated that he would disregard anything about the case that he may have heard outside the courtroom. He stated that his prior contacts with the State's Attorney, assistant State's Attorney, the sheriff, and the witnesses would not influence him and that he would give the testimony of these witnesses no greater weight than he would give the testimony of others. The trial court was apparently convinced of the truth of these statements. The contacts which Davis had with the participants in the trial were not such as to require us to say that the trial court could not believe his statement on

*voir dire* examination. Nor are they such as to compel us to say he is biased as a matter of law. (*Beck v. Washington, 369 U.S. 541, 557, 8 L. Ed. 2d 98, 112, 82 S. Ct. 955.*) The determination of the trial court as to the competency of the juror should not be set aside unless it is against the manifest weight of the evidence, which, we conclude, it is not.

The opinion of the appellate court indicates that a juror must be free from even the suspicion of bias or partiality. (132 Ill. App. 2d 1041, 1045-1046.) We wish to dispel this misconception. The determination of the qualification of the juror is a judicial determination. This determination by the court, like the determination of any other issue of fact, must be made from the evidence. (*Reynolds v. United States; Holt v. United States.*) Mere suspicion of bias is not evidence. The appellate court quoted from *People v. Cravens, 375 Ill. 495, 497.* The language in *Cravens* that a juror must be "wholly free from even the suspicion of bias" was borrowed from *Coughlin v. People, 144 Ill. 140,* at 163-164, which in turn referred to 3 Chitty, General Practice 795, as authority for the statement. In the latter, this language is found in a footnote reference to *Dauncey v. Berkeley,* a case argued in Kings Bench in Trinity Term 1827. In that case it appears that the juror was the assignee of a bankrupt plaintiff and although the amount of the verdict was small enough that the juror had no legal or beneficial interest in it "still there might be a *feeling* to increase the amount, and it was essential that every juryman should be *wholly free* even *from suspicion* of bias \*\*\*." The facts in *Dauncey* do not support the proposition that mere suspicion of bias or partiality is sufficient to disqualify a juror.

For the above reasons the judgment of the appellate court is reversed. The opinion of the appellate court states that the defendant raised eight issues to be considered by that court; however, the appellate court stated that it

would only discuss two of these issues, the impartiality of the jury and the question of search and seizure, finding that its decision on the question of the impartiality of the jury was dispositive of the case. The other issues that were raised in the appellate court and not considered by that court are not before this court. It is therefore necessary to remand the case to the appellate court for a consideration of the other issues which it did not previously decide.

Accordingly, the judgment of the appellate court is reversed and the cause remanded to the appellate court for further proceedings in conformity with this opinion.

*Reversed and remanded, with directions.*

MR. JUSTICE SCHAEFER, dissenting:

In my opinion the appellate court properly reversed the judgment of conviction because the trial judge, at the urging of the State's Attorney, required the defendant to stand trial before a juror whose prior associations with the prosecutors, the sheriff, and other prosecution witnesses, were such as to make it difficult, if not impossible, for him to be impartial. I think that the appellate court applied the correct standard in holding that the defendant had been deprived of his constitutional right to a trial before an impartial jury.

The facts disclosed on the *voir dire* examination of the juror Davis were thus stated by the appellate court:

"Davis was a lifelong resident of Sangamon County, whose wife was employed in the courthouse as a deputy of the Board of Review; whose son was employed as a civil engineer for the State of Illinois in the Highway Department; who had heard about the case through the news media; who had known the State's Attorney and his assistant for a number of years; who had worked for the State's Attorney in his campaign; who was a witness for the State's Attorney in a case in which he was privately employed; who was acquainted with one of the decedents and had

conversed with him on the telephone; who had lived next door to a doctor who was a material witness and who also had been the juror's family doctor for a number of years; who indicated he had known the assistant State's Attorney 'way back'; whose youngest son was married to a sister of a witness; who was related to another witness; who was personally acquainted with Edward Ryan, a material witness, and the sheriff of the county; who had served as treasurer of the campaign for Ryan; who had discussed this case with Ryan; ***." 132 Ill. App. 2d 1041, 1042.

The juror's doubt as to his own impartiality is the dominant theme that runs through his answers to the questions put to him on *voir dire.* When asked by the judge whether his decision would be influenced by his acquaintance with the prosecutors, he first answered: "Well, I would say that I would try to be fair. Let's put it that way." After the judge had admonished him, "*** you understand, if selected, that you are not to consider the fact that you may or may not know the attorneys on one side or the other in making a determination or in reaching a verdict in the case. You think you could do that?", he answered, "I believe so." And when further pressed, "Now, the fact that you know Mr. Terrell or Mr. Hollis, your situation there, now, you're telling the Court that would not in any way prejudice any of the rights of the defendant, is that correct?", he answered, "As I said, I would hope not. I'm human like everybody else, but I would generally—no." Subsequently, when asked by the State's Attorney whether their prior relationship "*** would not interfere with your duties as a juror if you are selected and you would render a fair and impartial verdict in this case, is that correct?", the witness answered, "I'm only human, but I would attempt not to, yes."

This prospective juror had managed the sheriff's election campaign, and had served as his campaign treasurer. The sheriff had talked to him about the case three or

four times, and was to be a witness. In answer to a question as to whether he could set aside what he had previously been told by the sheriff, he answered, "I believe I could, yes."

The trial judge appears to have overruled the defendant's challenge for cause upon the ground that he was required to accept the juror's statement as to his subjective frame of mind. Addressing defense counsel, the judge stated: "You put the Court in the position here that a man has made [*sic*] all the tests prescribed by law and if this Court were to dismiss this juror for challenge for cause it would be indicating that the Court would be not accepting what he said here."

This statement seems to suggest that the answers of a prospective juror as to his subjective frame of mind determine his qualification to serve as a juror. If this was true, there would be no useful function for the judge to perform. It is not true, and it is the duty of the judge to appraise the prospective juror's frame of mind and to base his ruling upon that appraisal.

In my opinion, the frank, natural answers of this prospective juror show that he was not qualified to serve as a juror. Even when pressed and prompted, his reservations as to his own impartiality were not dispelled.

I am further of the opinion that the appellate court properly based its ruling in part upon the statement, often reiterated by this and other courts, that "[i] t was a cardinal rule at common law that jurors, to be qualified as impartial, should stand indifferent between the parties and be wholly free from even the suspicion of bias." (*People v. Cravens (1941), 375 Ill. 495, 497;* see also, *State v. Jackson (Ravenell) (1964), 43 N.J. 148, 156-161, 203 A.2d 1, 5-8, cert. denied (1965), 379 U.S. 982, 13 L. Ed. 2d 572, 85 S. Ct. 690,* and cases cited therein.) To the extent that the majority opinion has attempted to depreciate the requirement that jurors be wholly free from the suspicion of bias, it has taken a long step backward.

MR. JUSTICE WARD joins in this dissent.