(No. 59326.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY PORTER, Appellant.

*Opinion filed February 21, 1986.*

388

CLARK, C.J., and SIMON and GOLDENHERSH, JJ., dissenting.

Remington, Kirkland & Klimek, Ltd., of Northlake, and Klimek & Richiardi, Ltd., of Chicago (Anthony J. Bassak and Robert F. Klimek, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Richard A. Stevens and Rebecca J. Davidson, Assistant State's Attorneys, of counsel),

for the People.

JUSTICE RYAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Anthony Porter, was found guilty of the armed robbery and unlawful restraint of Henry Williams (Ill. Rev. Stat. 1981, ch. 38, pars. 18—2, 10—3), the murder of Marilyn Green (two counts) (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2)), the murder of Jerry Hillard (two counts) (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2)), and two counts of unlawful use of weapons (Ill. Rev. Stat. 1981, ch. 38, pars. 24—1(a)(10), (b)). The State requested a separate sentencing hearing to consider whether the death penalty should be imposed. The defendant waived a jury for the penalty hearing (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)(3)), and the trial judge found the existence of a statutory aggravating factor (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3) (defendant convicted of murdering two individuals)) and concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the trial court sentenced the defendant to death for the murders of Marilyn Green and Jerry Hillard. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(h).) The death sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); Ill. Rev. Stat. 1981, ch. 38, par. 9—1(i); 87 Ill. 2d R. 603). The trial court also sentenced the defendant to a concurrent prison term of 30 years for the armed-robbery and unlawful-restraint convictions and the first unlawful-use-of-weapons conviction. The trial court determined that the second unlawful-use-of-weapons conviction "merged into [the] other counts." The defendant's subsequent motion for a new trial was denied by the trial court.

The defendant contends that he was denied his consti-

tutional right to a trial by an impartial jury and that the trial court erred in denying his motion for a new trial. For the reasons set forth below, we affirm the defendant's convictions and sentences.

The following evidence was presented at the defendant's trial. On August 15, 1982, at approximately 1 a.m., Henry Williams and William Taylor went to Washington Park in Chicago. They climbed a fence to enter the pool area in the park and went swimming. At the same time, Jerry Hillard and his fiancee, Marilyn Green, were sitting in the upper portion of bleachers located to the west of the pools. After swimming for a while Williams decided to get out of the water. As he was putting on his pants, the defendant approached with a gun in his hand and asked Williams if he had any money. The defendant put the gun up to Williams' forehead, took $2 from his pocket, and then left. Williams continued to get dressed and looked for Taylor, who was still in the pool. He then saw the defendant up in the bleacher area within three or four feet of Jerry Hillard with a gun pointed at Hillard. Williams finished dressing, and as he jumped back over the fence he heard several shots.

Taylor had continued to swim after Williams left the pool. He got out of the water and as he was drying off he saw the defendant up in the north end of the bleachers. The defendant was standing less than two feet from Hillard with his arm extended and a gun in his hand. The defendant shot Hillard. Hillard fell back, and the defendant shot him again. The defendant then ran down the bleachers toward Taylor, passed within three feet of him, and left the pool area to the south. Taylor went up to where Hillard had fallen. He did not see Marilyn Green shot.

Shortly after 1 a.m., on August 15, 1982, Officer Anthony Liance, of the Chicago police department, responded to a call that a man had been shot in Washing-

ton Park. As he approached the pool area from the north he observed Marilyn Green running from the north end of the bleachers. She was holding her neck with her right hand and pointed to the south end of the bleachers with her left hand. Liance continued to approach the pools and saw a person whom he later identified in court as being the defendant, running south next to the bleachers. He stopped and frisked the defendant, but let him go because he did not find a weapon on him. After running past Officer Liance, Green staggered toward Officer B. Johnson and his partner. The two officers were issuing a motorist a traffic citation at the time. Johnson helped Green into a squad car and noticed that there was a hole in her neck. She was taken to a hospital where she died.

Officer Dennis T. Dwyer and his partner also responded to the call. As they approached the pools from the north, Williams walked out from the bleachers and told them that a man had been shot up in the bleachers. Dwyer observed Hillard on the top step of the bleachers lying on his back and bleeding from the head. Hillard was taken to a hospital where he underwent surgery and later died.

Cook County Deputy Medical Examiner Joanne Richmond performed autopsies on both Marilyn Green and Jerry Hillard. Green had received three "through and through" gunshot wounds. She was shot twice in the right side of the neck at close range; within approximately 1 to 1½ feet. She was shot a third time in the left hand. Green died from massive bleeding due to multiple gunshot wounds. Hillard had been shot twice at close range; once above the left eye and once on the left side of the head. There was also a "black powdery substance" on the back of his left hand. Hillard died from multiple gunshot wounds to the head.

Both Henry Williams and William Taylor were taken

by the police from the pool area to a police station. Williams identified a photograph of the defendant in a mug book. He testified that he had seen the defendant in the neighborhood almost every day for a period of about a year and a half before Hillard and Green were shot. Taylor also identified a photograph of the defendant in a mug book. He had seen the defendant in the neighborhood once or twice a month for a period of two to three years prior to the shootings. Taylor testified that when he was at the police station on August 15, 1982, he told the police that he did not see the defendant shoot Hillard because he was afraid for his life. He had seen the defendant mug two old men and said that one of his friends had been jumped by the defendant. Taylor was living with his 95-year-old great-grandmother and stated that since he had to leave her alone when he went to work, he feared for her safety. On August 18, 1982, Taylor viewed a lineup at a police station and again identified the defendant.

The parties stipulated that the defendant was over 17 years old on the date of the occurrence. We note that the police officer who arrested the defendant on August 17, 1982, testified at trial that the defendant stated at the time of his arrest that he was 27 years old. The parties also stipulated that on October 6, 1980, the defendant had been convicted of robbery and that he was released from prison on that conviction on November 13, 1981.

The defendant called three witnesses on his behalf. Eric Werner, a professional photographer, presented testimony regarding the physical appearance of the pool area at Washington Park. Werner had photographed the area at the request of the defendant's counsel. The pictures were taken more than one year after Marilyn Green and Jerry Hillard were shot.

Kenneth Doyle also testified for the defendant. He stated that he was at the defendant's mother's house

during the evening of August 14, 1982, and sat on the back porch with the defendant drinking until about 2 a.m. the next morning. At that time he went with the defendant and a friend to a nearby playground where they talked and continued to drink until 9 a.m. On cross-examination Doyle admitted he had talked to two detectives on August 17, 1982, and told them that he was drinking with the defendant until about 10:30 p.m. on August 14, 1982, and then spent the rest of the night at home with his mother. At trial Doyle explained that he lied to the police because he was afraid he was going to be "locked up."

Finally, the defendant called Georgia Moody, the "common law" wife of one of his brothers. She saw the defendant at his mother's house during the evening of August 14, 1982, playing cards with her children along with Doyle. She testified that the defendant and Doyle did not go out on the porch and were not, to her knowledge, drinking. According to her, the defendant left the house at about 2:30 a.m. on August 15, 1982, with Doyle and a friend. The defense then rested.

The jury deliberated for approximately nine hours and found the defendant guilty of all charges. The jury was polled and then allowed to go home for the night, and it returned the next morning. That morning the State requested a sentencing hearing to consider whether the death penalty should be imposed. The defendant elected to waive his right to a jury for purposes of the two-phase death penalty hearing.

During the first phase of the death penalty hearing arguments were presented by both the State and the defense in regard to the defendant's eligibility for the death penalty. In addition, a certified copy of the defendant's birth certificate, showing defendant to be in excess of 18 years of age, and the verdict forms from his trial were admitted into evidence. The trial judge found that

the defendant had been convicted of murdering two or more individuals and that he had attained the age of 18 at the time he committed the murders. The judge therefore held that the defendant was eligible for the death penalty. At this time the judge had the jurors brought into the courtroom for the purpose of formally dismissing the jury. An oral motion for a mistrial was made by the defendant at that time. The court denied the motion, with leave to file a written motion later. The basis for the defendant's motion will be discussed below.

During the second phase of the death penalty hearing before the court, evidence was presented concerning matters in aggravation and mitigation. The following evidence was presented by the State in aggravation. On April 27, 1979, the defendant was placed on a two-year period of probation for bail jumping. The defendant violated his probation two months later when he robbed and beat Douglas McGhee. McGhee had been sitting on the bleachers next to the pools in Washington Park. On October 6, 1980, the defendant pleaded guilty to robbery and bail jumping and was sentenced to three years in the Illinois Department of Corrections. The defendant was released from prison on November 13, 1981, and was placed on parole for a period of two years.

On August 1, 1982, while on parole, the defendant got into an argument with a man in the neighborhood named Earl Lewis. The defendant had walked by and kicked Lewis' dog. When the defendant passed by again Lewis asked him why he kicked the dog. The defendant threatened to hurt Lewis, but then started to walk away. He then returned and placed a gun to Lewis' head and fired. The bullet grazed Lewis' forehead, who escaped much more serious injury by moving back just as the gun was fired. (On August 4, 1983, the defendant pleaded guilty to the aggravated battery of Earl Lewis and was sentenced to six years in the Illinois Depart-

ment of Corrections.) Two weeks after the defendant shot Earl Lewis, he committed the offenses that are the subject of this appeal.

The following evidence was presented by the defendant in mitigation. The defendant had attended a church and for approximately two years had helped clean the church. He had assisted an elderly gentleman who was recuperating from a heart attack by taking out the garbage and getting medicine for him. He also had assisted his godmother, who suffered from epileptic seizures, by cleaning her house, making her food, and helping her take her medicine. The defendant has five children; three from one relationship and two from another relationship. The defendant's mother, Clara Porter, related how she had tried to raise nine children in the housing project by herself. In addition, several witnesses expressed the opinion that the defendant could be turned into a useful citizen if he were given a chance and asked that his life be spared.

Following arguments of counsel, the trial court concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The defendant's subsequent written motion for a new trial was denied.

The defendant contends that he was denied his constitutional right to a trial by an impartial jury. He first argues in support of this contention that the scope of the *voir dire* examination as conducted by the trial court did not provide him with sufficient information to request challenges for cause or to intelligently exercise his right of peremptory challenge. The State argues that the adequacy of the *voir dire* examination was not raised in the defendant's written motion for a new trial and thus has been waived. Alternatively, the State maintains that the trial court's *voir dire* examination of the venire was thorough and meticulous. Defendant's second point un-

der his basic contention is that a member of the jury knew the mother of one of the victims, which fact did not come to light until after the jury had reached a verdict.

As previously stated, after the guilty verdict the jury was polled and then was allowed to go home for the night. The next morning, before the hearing commenced as to the penalty, the defendant waived his right to a jury for the death penalty hearing. The trial court conducted the hearing and determined that the defendant was eligible for the death penalty. At that point, before the second phase of the death penalty hearing (the aggravation-mitigation phase), the judge noted for the record that the jury had not been formally dismissed. When the jury was brought into court to be discharged, the following colloquy took place, which is the basis for defendant's second point, that is, that a member of the jury knew the mother of one of the victims:

"THE COURT: Ladies and gentlemen, I did not formally dismiss you so you are still under oath, under the oath that you took as jurors. It was brought to my attention before I actually formally dismissed you that one of the jurors stated that he knew that some other juror purportedly or allegedly went to church— to the same church as one of the decedent's mother. Is that right, was that your— please identify yourself.

MRS. TRICKLET [sic] [The juror's name was Lillie B. Trigleth]: Yes, but that didn't make any difference to me about that.

THE COURT: Thank you, ma'am. It didn't make any difference?

MRS. TRICKLET: No.

THE COURT: Ma'am, your name again?

MRS. TRICKLET: Lilly B. Tricklet.

THE COURT: It didn't make any difference to you, you abided by your oath and did you recognize that fact when I had read you the name of all the witnesses in the beginning before we even started, you didn't recognize

that?

MRS. TRICKLET: No.

THE COURT: When did you finally recognize—

MRS. TRICKLET: After it had got started and everything was going on.

THE COURT: But, it made no difference to you, is that right?

MRS. TRICKLET: No, that is right.

THE COURT: I will now formally dismiss you. You are all dismissed.

\*\*\*

THE COURT: The jury is dismissed. We will proceed as indicated.

\*\*\*

MR. GURSEL [Defense Attorney]: I would like to speak for the record. Judge, this woman has indicated that she— this case was not over when it came to her attention that she knew a member of this family. That matter was supposed to have been brought to this Court's attention. We had two alternates, two alternate jurors. At this point and [sic] time I am asking this Court for an opportunity to present information to this Court to prepare for a mistrial and respectfully come before this Court and ask that the judgments entered on the record of conviction as to Anthony Porter be set aside and that he be given a new trial, Judge.

THE COURT: Any motion for mistrial relative to what just occurred are [sic] premature at this time. If anything, you can present those [sic] after the entire hearing.

\*\*\* I did bring back the entire jury and I had not dismissed them and the lady that identified herself was under oath and said for the record that the facts that came to light after the case, sometime after the case had commenced, in earnest, didn't influence her whatsoever.

\* \* \*

MR. GURSEL: \*\*\* I believe that the Court should have questioned this juror in detail as to her relationship to that family and to what particular point and [sic] time she had knowledge, how long she has had the knowledge

and rationale for not bringing this to the Court's attention in view of fact that there are two alternates here.

THE COURT: This Court feels it didn't abuse its discretion. This Court hereby accordingly denies motion for mistrial. At a further time you may put it in writing, whatever you state in writing, you are welcome. ***"

A short time after the above colloquy defense counsel again requested a mistrial. The State objected to the motion on the ground that it was not in writing and also on the ground that it was not timely. The trial court denied the motion, stating that defense counsel could outline in writing anything deemed pertinent to a motion for a "new trial."

We consider now defendant's issue concerning the adequacy of the *voir dire*. The general rule followed by this court is that the failure to raise an issue in a written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal on review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282.) Here, the defendant's written motion for a new trial did raise the issue of whether he was denied a trial by an impartial jury. It specifically referred to the presence on the jury of a woman that attended the same church as the mother of one of the victims, but the motion did not question the adequacy of the *voir dire* examination. We again emphasize that although death penalty cases such as this are automatically reviewed by this court under our constitution (Ill. Const. 1970, art. VI, sec. 4(b)), trial counsel continues to have an obligation to comply with the statutory provisions governing motions for a new trial. Ill. Rev. Stat. 1981, ch. 38, par. 116—1; *People v. Caballero* (1984), 102 Ill. 2d 23, 32-33.

As to the adequacy of the *voir dire*, the trial court began the examination by reading each of the charges that had been brought against the defendant. It then read the names of the defendant, the defendant's two at-

torneys, the two assistant State's Attorneys, and the potential witnesses. The court also informed the prospective jurors as to fundamental principles of law such as the presumption of innocence and the burden of proof. Thereafter, the court asked the group seven "general" questions. The first general question was whether there were any hardships that would prevent them from serving on the jury. The second general question was whether they had scruples which would prevent them from imposing the death penalty under any circumstances. Other general questions involved whether they had served on a petit or grand jury, whether they had participated in a criminal case as a complainant or defendant or in any other capacity, and whether they had been the victim of a crime. The last general question asked by the trial court was "Do you know of any reason why you may be prejudiced for or against the State or the defendant because of the nature of the charges or otherwise?"

Next, the court questioned the prospective jurors individually. After reviewing their responses to the seven general questions, it inquired into personal factors such as residence, family, and employment. The court also asked the prospective jurors whether they would be prejudiced against a person that had been convicted of a crime and whether there was any reason they could not be fair to either side. Although the trial court asked all the questions during the *voir dire* examination, it did allow the parties to submit additional questions. Defense counsel submitted to the court four supplemental questions. As requested, the court agreed to ask the prospective jurors whether they had scruples which would prevent them from even considering the death penalty and whether they had feelings for or against people living in public housing. It refused to ask the prospective jurors whether they had any black friends and about their feel-

ings regarding members of street gangs. The trial court granted numerous requests by defense counsel for sidebar conferences, several of which were used by defense counsel to record the race of those excluded by the State through peremptory challenges. Finally, on several occasions defense counsel interrupted the *voir dire* examination to request background information about prospective jurors.

Our Rule 234 (87 Ill. 2d R. 234), made applicable to criminal cases by Rule 431 (87 Ill. 2d R. 431), provides in pertinent part:

> "The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper."

Thus, the manner and scope of the *voir dire* examination is left to the discretion of the trial court. However, it may constitute reversible error if the court fails to permit pertinent questions that would enable a party to determine whether the jurors are free from bias or prejudice which would constitute a basis for challenge for cause, or which would enable a party to intelligently exercise his or her right of peremptory challenge. *People v. Lobb* (1959), 17 Ill. 2d 287, 300.

The defendant maintains that the trial court should have asked the prospective jurors during *voir dire* whether they were acquainted with any of the parties, attorneys, witnesses, victims, or their families and whether they were in any manner familiar with the facts of the case. However, defendant's counsel did not request that the court ask either of those questions. If defense counsel had felt that he did not have sufficient in-

formation concerning any of the prospective jurors he could have asked the court to inquire further by submitting additional questions as authorized by Rule 234. We noted above that defendant did submit four additional questions. The court asked two of the supplemental questions submitted by the defendant and he has not alleged that the court erred in refusing to ask the other two questions he submitted. We hold that the scope of the *voir dire* examination as conducted by the trial court did not deny the defendant his constitutional right to a trial by an impartial jury.

The defendant's second argument supporting his contention that he was deprived of his right to trial by an impartial jury is that the trial court erred in denying his motion for a new trial which was based in part on the fact that Mrs. Trigleth did not disclose during *voir dire* that she went to the same church as the mother of one of the murder victims. On appeal, the defendant has not pursued the other grounds raised in his written motion for a new trial. The State responds that the trial court properly concluded that Mrs. Trigleth was free from prejudice when she determined the defendant's guilt or innocence.

Attached to the defendant's written motion for a new trial was the affidavit of Isaias Torres, one of the jurors in the defendant's case. In the affidavit Mr. Torres stated that "a fellow juror informed him that another juror sitting in judgment of the facts with them on the above-captioned case, knew the deceased, Marilyn Green's mother and attended church with her." He further stated that "this same Black female juror [Mrs. Trigleth], when the jury was given the case to deliberate on, entered the jury room and said as far as she was concerned, they could vote guilty right then, and she made this statement before any discussion was had on the evidence ***."

The general rule in cases such as this involving information that is not disclosed by a juror during *voir dire* is that a motion for a new trial will not be granted unless it is established that prejudice resulted. Whether the motion for a new trial is granted is within the discretion of the trial court. (*Pekelder v. Edgewater Automotive Co.* (1977), 68 Ill. 2d 136, 139; *Department of Public Works & Buildings v. Christensen* (1962), 25 Ill. 2d 273, 279-80.) This rule has been held applicable in criminal cases. See *People v. Harris* (1979), 74 Ill. 2d 472.

The defendant contends that the questions the trial court asked Mrs. Trigleth just prior to dismissing the jury were not sufficient to determine whether prejudice in fact existed. He maintains that the court should have asked Mrs. Trigleth the extent of her relationship with Marilyn Green's mother. It is true that the court's inquiry could have, and possibly should have, been more searching to determine the nature of the relationship between the juror and Ms. Green's mother. However, the defendant preserved the issue and properly raised it in the motion for a new trial. At the hearing on this motion the defendant had the opportunity to establish the nature of the relationship in question and to show that he was prejudiced. He could have subpoenaed the juror and others to testify at the hearing on his motion for a new trial. Alternatively, counsel could have attached an affidavit from Mrs. Trigleth stating whether she was actually acquainted with the victim's mother and, if so, the extent of that relationship. Defense counsel chose to do neither.

The granting or refusing of a new trial because of the claimed disqualification of a juror is within the sound discretion of the trial court. (*People v. Cole* (1973), 54 Ill. 2d 401, 414; *People v. Gold* (1967), 38 Ill. 2d 510, 516.) Also, mere suspicion of bias or partiality is not sufficient to disqualify a juror. *People v. Collins* (1985), 106 Ill. 2d

237, 274; *People v. Cole* (1973), 54 Ill. 2d 401, 415.

The burden in this case was on the defendant to support the allegations of his post-trial motion. It was incumbent upon him to establish the nature of the relationship between the juror and the victim's mother. Although the defendant argues that the juror was a friend of the victim's mother, nothing in the record supports this conclusion. All that the record shows is that the juror, during the course of the trial, learned or realized that she knew the victim's mother as someone who attended the same church that she attended. The record does not even disclose the name of the victim's mother, nor does it disclose that the juror knew her name. Not only should the defendant have shown the nature of the relationship between the juror and the victim's mother, but he also had the burden of showing that he was prejudiced by this juror's service. (See *People v. Brinn* (1965), 32 Ill. 2d 232, 239; *People v. Stacey* (1962), 25 Ill. 2d 258, 270, *overruled on other grounds*, *People v. Nunn* (1973), 55 Ill. 2d 344, 349; *People v. Berry* (1960), 18 Ill. 2d 453, 459; *People v. Potts* (1949), 403 Ill. 398, 402-03; *People v. Phelps* (1944), 388 Ill. 618, 624; *People v. Coniglio* (1933), 353 Ill. 643, 655; *People v. McInnis* (1980), 88 Ill. App. 3d 555, 571; *People v. Boyce* (1977), 51 Ill. App. 3d 549, 562; *People v. Hall* (1973), 17 Ill. App. 3d 1, 4.) If the defendant could not show that he was actually prejudiced, then the burden was on the defendant to establish that the relationship between the juror and the victim's mother was of such a character that a presumption of prejudice would arise therefrom. If the State could not rebut this presumption, the court could have granted a new trial. (See generally 24 C.J.S. *Criminal Law* sec. 1447 (1961).) The defendant has not sustained his burden of proof on this issue.

The defendant further maintains that the statement Mrs. Trigleth made upon entering the jury room, consid-

ered along with her relationship with the victim's mother, "raise the suspicion" that her verdict was based on evidence other than that presented at trial. Yet, as noted above, mere suspicion of bias or prejudice is not sufficient. (*People v. Cole* (1973), 54 Ill. 2d 401, 415.) Mrs. Trigleth's statement in the jury room does not establish that she had previously determined the defendant's guilt. Nor was it improper for her to make the statement at that time; the jury had retired to the jury room to begin its deliberations. In doing so some member of the jury must, of necessity, be first to voice an opinion. The defendant speculates that Mrs. Trigleth "may have had some vendetta" against him. However, an equally reasonable explanation for her statement is that after attentively and conscientiously listening to all the evidence presented at trial, she concluded that the evidence against the defendant was overwhelming, which it was.

Likewise, Mrs. Trigleth's failure to realize that Marilyn Green's mother was the same woman who went to her church could easily be explained by the fact that she did not know the woman's name. Also, the fact that Mrs. Trigleth did not realize that she attended the same church until after the trial had begun would make it appear unlikely that she had a close relationship with the victim's mother. We note that Mrs. Trigleth never stated that she actually knew the victim's mother.

We hold that the trial court did not err in denying the defendant's motion for a new trial.

The last matter before us involves a motion by the State to strike a portion of the defendant's oral argument. This motion was taken with the case. During oral argument defense counsel contended that as a result of the trial court's denial of his oral motion for a new trial he was forced to choose between having his sentence determined by the court or by a tainted jury. Counsel main-

tained that this effectively left the defendant with no choice at all and that therefore the defendant was denied his right to have an impartial jury determine the appropriate sentence.

We agree with the State that this issue has been waived. The defendant did not raise it in his written motion for a new trial (see *People v. Pickett* (1973), 54 Ill. 2d 280) or in his appellate brief (see 87 Ill. 2d R. 341(e)(7)). We note in passing, however, that defense counsel's recollection of the facts appears to be mistaken. The record indicates that the fact that Mrs. Trigleth went to the same church as the mother of one of the victims was not brought to the attention of the trial court until after the defendant waived his right to a jury for purposes of the death penalty hearing. During the jury-waiver proceeding the defendant did argue the possibility that the jury had been tainted because of an article in newspapers which were found in the jury room, but not that the jury was tainted by the presence of Mrs. Trigleth. However, the issue raised at trial has not been argued on appeal. The record indicates that the defendant made a knowing and intelligent waiver of the jury and did not do so because of any possible prejudice on the part of Mrs. Trigleth. In any event, our criminal code, in addition to providing for a waiver of the jury at the penalty hearing, also provides that for good cause shown, the court may discharge the jury that determined the defendant's guilt and impanel another jury for the sentencing hearing. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)(2)(C).) The defendant never requested that another jury be impanelled. The motion by the State to strike this part of defendant's argument is allowed.

For the foregoing reasons, we affirm the defendant's convictions and sentences. The clerk of this court is directed to enter an order setting Wednesday, May 21, 1986, as the date on which the sentence of death, en-

tered in the circuit court of Cook County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

CHIEF JUSTICE CLARK, dissenting:

In this case, a member of the jury that found the defendant guilty of murder *knew* the mother of one of the victims. They both attended the same church. I would hold that the defendant was deprived of the right to trial by an impartial jury, and I would reverse his conviction. Therefore, I respectfully dissent.

The majority holds that the defendant had the burden of either showing that he was prejudiced by Mrs. Trigleth's jury service (111 Ill. 2d at 404), or "that the relationship between the juror and the victim's mother was of such a character that a presumption of prejudice would arise therefrom." 111 Ill. 2d at 404.

The majority suggests that to establish this prejudice the defendant "could have subpoenaed the juror and others to testify at the hearing on his motion for a new trial" or "[defense] counsel could have attached an affidavit from Mrs. Trigleth stating whether she was actually acquainted with the victim's mother and, if so, the extent of that relationship." 111 Ill. 2d at 403.

The defendant did attach the affidavit of Mr. Torres, one of the jurors, to his written motion for a new trial. The information in the affidavit tended to establish that Mrs. Trigleth "knew" and "attended church" with the victim's mother and that Mrs. Trigleth had made up her

mind to find the defendant guilty without conferring with her fellow jurors. This affidavit in my opinion raised a presumption of prejudice.

The majority's second suggestion, that defense counsel should have attached an affidavit of Mrs. Trigleth stating whether she was acquainted with the victim's mother and the extent of the relationship, is unrealistic. It is highly unlikely that a woman who has been named by defense counsel as possibly tainting a murder trial, because she did not properly reveal to the trial judge that she knew the victim's mother, would now cooperate with defense counsel and sign such an affidavit.

The majority engages in speculation regarding Mrs. Trigleth's relationship with the victim's mother. The majority states:

"Likewise, Mrs. Trigleth's failure to realize that Marilyn Green's mother was the same woman who went to her church could easily be explained by the fact that she did not know the woman's name. Also, the fact that Mrs. Trigleth did not realize that she attended the same church until after the trial had begun would make it appear unlikely that she had a close relationship with the victim's mother. We note that Mrs. Trigleth never stated she actually knew the victim's mother." 111 Ill. 2d at 405.

The majority could have speculated to the contrary. It could just as easily be true that Mrs. Trigleth realized that she knew the victim's mother and went to church with her and that she chose to remain on the jury to make sure that the defendant would get "proper punishment." Of course, all of this is speculation, but what is not speculation is the fact that the defendant's life is now hanging in the balance.

It may be true that Mrs. Trigleth never stated that she "knew" the victim's mother, but that was because the trial judge never asked her that question or any

other specific questions which he should have asked to determine whether any possible prejudice existed. It seems to me that a substantial question had been raised as to this juror's possible partiality and the trial judge should have pursued it further.

In my dissent in *People v. Collins* (1985), 106 Ill. 2d 237, I quoted from the case of *People v. Cole* (1973), 54 Ill. 2d 401, wherein this court stated:

"The right to a trial by an impartial tribunal is so basic that a violation of the right requires a reversal. (*Chapman v. California* [(1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824]; *Tumey v. Ohio* [(1927), 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437].) The right to a jury trial guarantees to one accused of a crime a fair trial by a panel of impartial jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *Turner v. Louisiana* [(1965), 379 U.S. 466, 471-72, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546, 549]." 54 Ill. 2d 401, 411.

In summary, I believe the defendant was denied his right to trial by a panel of impartial jurors when one of the jurors knew and attended church with the mother of one of the victims, and therefore I believe the majority should have reversed the defendant's conviction.

It is for the above-enumerated reasons that I respectfully dissent.

GOLDENHERSH and SIMON, JJ., join in this dissent.

JUSTICE SIMON, also dissenting:

Although due process does not require a new trial every time a juror has been placed in a potentially compromising situation, what it does mean is "a jury capable and willing to decide the case solely on the evidence before it, and *a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such oc-*

*currences when they happen."* (Emphasis added.) (*Smith v. Phillips* (1982), 455 U.S. 209, 217, 71 L. Ed. 2d 78, 86, 102 S. Ct. 940, 946.) Thus, when the possible bias of a juror is raised, a defendant is entitled to a hearing on the issue at which he is allowed to participate meaningfully. (455 U.S. 209, 216-17, 71 L. Ed. 2d 78, 85-86, 102 S. Ct. 940, 945-46.) Because the investigation of the juror's possible bias fell far short of these standards here, and because substantial evidence of bias appears on the record, I would reverse the conviction.

The trial judge apparently recognized that he had some obligation to make inquiry of the juror. He initially called upon the juror who "purportedly or allegedly went to *** the same church" as the mother of one of the victims to identify herself. Mrs. Trigleth answered by stating "that didn't make any difference to me about that." Rather than probing the basis of her relationship with the victim's mother, the judge simply asked the juror several times in a leading fashion to reaffirm that her acquaintance with the mother did not influence her. The only other questions the judge asked were whether she recognized the name when he read the list of witnesses and at what point the juror became aware that she knew the victim's mother; on the latter question he accepted an inconclusive answer. The colloquy could have lasted only seconds.

This interrogation of Mrs. Trigleth was deficient in two respects. First, as Chief Justice Clark points out, the trial judge failed to explore the facts which may have established the juror's bias. For all the judge knew, the juror and the victim's mother could have been close friends. By failing to inquire in detail into their relationship, the court ignored the fact that "[d]etermining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may

be unaware of it." (*Smith v. Phillips* (1982), 455 U.S. 209, 221-22, 71 L. Ed. 2d 78, 89, 102 S. Ct. 940, 948 (O'Connor, J., concurring).) The difficulties inherent in exposing actively concealed or subconscious biases could hardly have been overcome by simply accepting and leading the juror into repeating her conclusory statement that she was not influenced by her relationship with the mother without determining what that relationship was.

This court's prior cases involving similar allegations of juror bias demonstrate that more extensive questioning was imperative. For example, in *People v. Davis* (1983), 95 Ill. 2d 1, a juror advised the court during the course of trial that a friend of his was related to someone murdered in an incident with which the defendant may have been connected. The subsequent interrogation disclosed the nature of his relationship with the friend, the friend's feelings about the killing, and the fact that the juror had not been personally acquainted with the victim; it also explored the questions of possible embarrassment to the juror from sitting on the jury and whether the incident would have any effect on his deliberations. Similarly, in *People v. Hyche* (1979), 77 Ill. 2d 229, the court learned after the jury had been sworn that one juror's husband was a nephew of the man the defendant was charged with killing. Inquiry revealed that the juror's personal contacts with the deceased were limited to five or six meetings at family gatherings, that her relationship with the deceased would not influence her, and that her family had urged her not to sit on the jury.

By contrast, the court in the instant case made no effort to uncover the extent of the relationship between Mrs. Trigleth and the victim's mother or other facts relevant to the question of bias. The court, for example, did not determine at precisely what point during the trial

the juror became aware that she knew the mother or why she failed to bring it to the judge's attention promptly.

The second reason that the interrogation of the juror was inadequate is because defense counsel was not permitted to participate. Following Mrs. Trigleth's final reiteration that her acquaintance with the victim's mother made no difference, the court stated that the jury would be dismissed. Although the majority opinion does not mention it, the record reveals that defense counsel then asked whether the "[d]efense [was] going to have any questions on this case," apparently before the jury was actually excused. The court's response was to repeat the order that the jury be dismissed.

The effective refusal of the trial judge to let defense counsel question the juror was error. In *Smith v. Phillips*, the Supreme Court found that determinations of juror bias can properly be made at a hearing " 'with all interested parties permitted to participate.' " (See 455 U.S. 209, 216, 71 L. Ed. 2d 78, 85, 102 S. Ct. 940, 945, quoting *Remmer v. United States* (1954), 347 U.S. 227, 230, 98 L. Ed. 654, 656, 74 S. Ct. 450, 451.) The correct procedure, allowing defense interrogation of a potentially biased juror, has been employed by the trial courts of this State in similar cases. (See, *e.g., People v. Davis* (1983), 95 Ill. 2d 1; *People v. Harris* (1979), 74 Ill. 2d 472; see also *United States v. Billups* (4th Cir. 1982), 692 F.2d 320.) The failure to permit defense counsel here to interrogate the juror was an abuse of discretion.

The majority acknowledges that the trial judge's abbreviated inquiry "could have, and possibly should have, been more searching." (111 Ill. 2d at 403.) The majority opinion nonetheless concludes that no abuse of discretion occurred because the burden of establishing prejudice rested with the defendant and that burden could have been carried, at least in theory, by forcing a proper in-

vestigation on the court at a hearing on the post-trial motion. As I view the majority opinion, it both underestimates the importance of a prompt judicial inquiry into a juror's bias and misreads the record in sanguinely assuming that the judge would have permitted further questioning of the juror at a post-trial hearing.

Obviously, in cases in which a juror's potential bias comes to light only after the conclusion of the criminal proceedings, the hearing to determine whether such bias actually exists must necessarily occur in the context of a post-trial motion. However, common sense rejects the notion that resolution of the issue should also await a post-trial hearing when the possibility of prejudice is revealed, as here, prior to the dismissal of the jury. In the latter situation, an immediate inquiry is appropriate. (See, *e.g., People v. Davis* (1983), 95 Ill. 2d 1; *People v. Hyche* (1979), 77 Ill. 2d 229; *People v. Harris* (1979), 74 Ill. 2d 472.) An immediate investigation, quite apart from the saving of judicial resources, best serves to correctly resolve the claim of bias.

As noted above, I also disagree with the court on another score: the speculative suggestion that defendant could have subpoenaed Mrs. Trigleth to testify at a post-trial hearing (111 Ill. 2d at 403). Examination of relevant portions of the record, some of which are not excerpted in the majority opinion, leads me to the same conclusion defense counsel could have reached, namely, that no such testimony would have been permitted. Upon defense counsel's suggestion that a mistrial should be granted, the judge stated in part:

"This Court will state for the record that *in an unusual proceeding, I think probably the most unusual I have ever engaged in in all my years as a lawyer and as a Judge,* I did bring back the entire jury and I had not dismissed them and the lady that identified herself was under oath and said for the record that the facts that came to light

after the case, sometime after the case had commenced, in earnest, didn't influence her whatsoever.

*Accordingly, this Court felt that going beyond that regarding that issue is not—would not have been proper, would have invaded the sanctity of the jury and jury deliberation.* Mr. Porter talked to and did, in fact request and have his constitutional right to a jury. *That lady was under oath. She was not on trial, Mr. Porter was."* (Emphasis added.)

This statement makes clear that the trial judge believed that he had already, in a "most unusual" proceeding, gone above and beyond the call of duty in his questioning of the juror and that more searching inquiry would have been improper as an invasion of the "sanctity" of the jury. I can only surmise that the judge's opinion that Mrs. Trigleth could not be subjected to further interrogation without compromising jury deliberations or putting her "on trial" would not have been any different at a post-trial hearing and that any effort to question her at that point would have been rejected. Thus, counsel can hardly be faulted for failing to subpoena her.

The defendant only had the burden of establishing the juror's "disqualifying state of mind" (*People v. Cole* (1973), 54 Ill. 2d 401, 413), not, as the majority states, that "he was prejudiced by this juror's service" (111 Ill. 2d at 404) or that the outcome of the trial was affected. (See 54 Ill. 2d 401, 411 (harmless-error rule does not apply to claim that the jury was not impartial).) Although the actions of the trial judge severely limited his opportunity to make such a demonstration, I believe, with Chief Justice Clark, that there is sufficient evidence of bias on this record to require a new trial.

At the beginning of *voir dire*, the judge read a list of potential witnesses but omitted to instruct the jurors to state whether they recognized any of the names. Al-

though it is understandable that Mrs. Trigleth could have initially missed or failed to recognize the name of Marilyn Green's mother in that list, at the point in the trial when she did recognize that someone she knew was involved, she had a duty to so inform the judge. Inasmuch as she thought her acquaintance with the victim's mother was sufficiently important to disclose that information to another juror, Mr. Torres, her failure to similarly inform the trial judge can hardly be dismissed as innocuous or merely unthinking. Rather, her apparent suppression of this relationship from the judge makes her impartiality suspect. Coupled with this failure to disclose, the evidence that upon entering the jury room and prior to any deliberations Mrs. Trigleth said that "as far as she was concerned, they could vote guilty right then" was, in my view, sufficient for the defendant to carry his burden of establishing the juror's bias.

It is no answer to say, as the majority does, that the defendant is at fault for not making the right moves. The question of juror bias, unlike a mere evidentiary irregularity, goes to the heart of the judicial process. Whether or not the defendant exercised every available option, a guilty verdict in a case in which the process itself has been tainted cannot be affirmed.

The decision to uphold the conviction here debases the fundamental right to a "fair trial by a panel of impartial, 'indifferent' jurors" (*Irvin v. Dowd* (1961), 366 U.S. 717, 722, 6 L. Ed. 2d 751, 755, 81 S. Ct. 1639, 1642). Because that right is the hinge upon which our entire system of criminal justice turns, I am compelled to dissent.

JUSTICE GOLDENHERSH joins in this dissent.