THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS SZUDY, Defendant-Appellant.

First District (1st Division)   No. 1—91—3950

Opinion filed May 16, 1994.

Rita A. Fry, Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eileen Rubin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Dennis Szudy was convicted of first-degree murder and concealment of a homicidal death. The trial judge also found defendant to be a habitual criminal pursuant to

section 33B—1 of the Criminal Code of 1961. (Ill. Rev. Stat. 1991, ch. 38, par. 33B—1 (now 720 ILCS 5/33B—1 (West 1992)).) Accordingly, the trial judge sentenced defendant to a sentence of natural life imprisonment pursuant to section 33B—1 to be served consecutively with a five-year sentence of imprisonment for concealment of the death. On appeal, defendant contends that: (1) the elicitation of highly prejudicial testimony by the prosecutor constituted reversible error and denied him due process; (2) the admission of highly prejudicial testimony denied him his right to a fair trial; (3) the court's excusal of several jurors for cause denied him his right to a fair trial; (4) prosecutorial misconduct during closing argument denied him his right to a fair trial; (5) the improper exclusion of favorable evidence denied him his right to a fair trial; (6) the publication of morgue photographs of the victim to the jury denied him his right to a fair trial; (7) he was not proven guilty beyond a reasonable doubt; (8) section 33B—1 of the Criminal Code of 1961 pursuant to which he was sentenced is unconstitutional; and (9) his conduct was not exceptionally brutal or heinous and, therefore, a natural life sentence was unwarranted. We affirm defendant's convictions and sentences.

On November 25, 1989, Sergeant George Owen of the Chicago police department received an anonymous phone call from a male individual who suggested that the police check the sewers at 42nd and Packers. The anonymous caller further stated that, if a body were discovered, to look for an automobile with Illinois license plate number SM 1972.

On November 27, 1989, the police discovered the partially decomposed and skeletonized body of a white female who had been shot five times. The body was wrapped in a "bundle" which consisted of three layers. The outermost layer was a sheet. The next layer consisted of a large plastic asbestos removal bag which was secured with a coat hanger. This bag was marked "Disposalene," "asbestos removal," and "danger." The innermost layer in which the body was wrapped was a large beige quilt or comforter. The body was clad in a black sweater pushed up over the breasts, a T-shirt and two gold chains. The ankles and hands were secured with coathangers.

Dr. Robert Kirschner, an assistant medical examiner, performed the autopsy on the body and determined that the cause of death was multiple gunshot wounds. He also determined that the victim's blood type was type B. In his opinion, the body had been in the sewer for "more than many weeks" and could have been there for as long as 10 months. Based on dental records, he identified the body as that of Yvonne Minchuk. According to Dr. Kirschner, Yvonne had been shot twice in the back of the head, twice in the chest, and once in the

back. Dr. Kirschner also recovered four .22-caliber long rifle bullets from the body. Jeanette Minchuk, Yvonne's mother, was able to identify her daughter's body at the morgue by her rose and butterfly tattoos. Pursuant to further investigation, the police discovered that Illinois license plate number SM 1972 was registered to Lucille Werner, who lived at 4302 South Honore. The police proceeded to the address, which was only approximately a half mile from the sewers at 42nd and Packers. The building at 4302 South Honore was a residential building consisting of six apartments. The police observed a 1979 white Chevrolet Chevette with license number SM 1972 parked directly across the street from the location.

The police spoke with Lucille Werner, who turned out to be a former girl friend of the defendant, Joseph Parejko, and Charles Kelsay. The police discovered that near the end of January 1989, a 28-year-old female named Yvonne Minchuk had disappeared from the building. They also learned that Yvonne, a prostitute and drug addict, was defendant's girl friend and had resided with him in his third-floor apartment.

On November 27, 1989, Detective Thomas Ptak arrested defendant and transported him to Area 3 police headquarters. Defendant gave Ptak the keys to his apartment saying that he had "nothing to hide" and wanted to cooperate. Ptak searched defendant's apartment and inventoried several "love" letters from Yvonne to defendant, a blue and yellow comforter with reddish stains on it, and a plastic bag marked "Disposalene." On November 29, 1989, Detective Charles Freed also searched defendant's apartment. Freed observed numerous bullet holes in the walls of the apartment and a .22-caliber cartridge was discovered in the bedroom wall.

Jeanette Minchuk testified that her daughter was defendant's girl friend for approximately two years. She stated that in December 1988, Yvonne and defendant drove to her home in Hammond, Indiana, to drop off Yvonne's daughter Gretchen. According to Jeanette, Yvonne and defendant had packed Gretchen's clothing in a heavy black bag marked "Asbestos" and "Warning" and had taken the bag with them when they left. She testified that this was the last time she saw her daughter alive.

According to Jeanette, in January 1989, after she had not heard from her daughter, Jeanette called defendant, attempted to file a missing person's report in Hammond and called the jails. She further asserted that, in March 1989, defendant visited Jeanette in Hammond. Jeanette stated that he told her that Yvonne had left him in January 1989, had stolen money from him and that, if he caught her, he would kill her.

Donald Busse, Jeanette's live-in boy friend, testified that defendant visited him in December 1988, after Yvonne had left defendant and Jeanette had left him. According to Busse, defendant told him "Give me five thousand dollars, I'll take care of both of them." Busse admitted, however, that he did not inform the police about this threat until after Yvonne's body was discovered.

Rory Compton, an ex-felon who had been convicted of armed robbery in 1982, testified that defendant spent Christmas Day in 1988 with him and his wife in Belleville, Illinois. Compton testified that defendant asked him where he could get a gun for the purpose of protecting himself from Yvonne's pimps. Compton stated that he gave defendant his wife's Jennings handgun, which was a .22-caliber long rifle semi-automatic pistol. According to Compton, he never saw or heard from defendant again and his attempts to retrieve the gun were unsuccessful.

When the Compton residence was burglarized in March 1989, however, Compton reported to his insurance company that the handgun had been stolen. He stated that he had lied to the insurance company and to the police about the gun. He also asserted that defendant had said that he was upset with Yvonne because she kept getting arrested and that he had told Yvonne that, if she got arrested again, he would get rid of her.

Charles Kelsay, an ex-felon who had been convicted of burglary in 1981, testified that he lived in a second-floor apartment at 4302 South Honore and that he had known defendant for approximately six years. Kelsay worked for an asbestos removal company and stated that he would bring home large plastic asbestos removal bags and give them to his neighbors. He testified that he had given two such bags to defendant and Yvonne. Kelsay also stated that, in December 1988, defendant told him that Yvonne had been arrested and that he was going to bail her out of jail. According to Kelsay, after defendant bailed Yvonne out of jail, he saw her around the building for about three days. Sometime later, defendant brought Yvonne's clothing and make-up over to Kelsay's apartment and asked Kelsay's daughter if she wanted them because Yvonne had left and was not coming back. According to Kelsay, defendant told him on one occasion that he thought Yvonne was in New York and, at another time, that he had spoken with Yvonne's mother and that Yvonne was in jail in Indiana.

Kelsay also testified that, on July 4, 1989, defendant had a Jenning's semi-automatic handgun which he and defendant fired at a tree. He stated that he purchased the gun from defendant for $75 and then sold it to Harry Sells for $100. Sells subsequently turned

the gun in to the police and both Sells and Kelsay identified the gun in court.

On cross-examination, Kelsay admitted that Yvonne was a prostitute and that he had seen Yvonne "shoot up" drugs. He also stated that he had seen blood dripping from her arms and that she would use a towel to stop the bleeding. He also stated that defendant would be on the road for days and weeks at a time because he was a truck driver and that, while he was away, Yvonne would have male visitors in the apartment.

Joseph Parejko lived in a third-floor rear apartment at 4302 South Honore with Lucille Werner and her daughter Sandra. Lucille Werner died of leukemia on April 2, 1990. Parejko stated that the last time he saw Yvonne was near the end of January 1989. He testified that, after Yvonne disappeared, the defendant told him that she had gone away, but had left her belongings. Parejko also stated that defendant told him that Yvonne had taken him for "two grand" and then stolen $250 from him. Parejko knew that defendant had recently posted a $2,000 bond in order to bail Yvonne out of jail. Subsequently, defendant gave some of Yvonne's clothing to Lucille and her daughter. Parejko also stated that he had seen defendant with the black asbestos bags he had obtained from Kelsay. Parejko also identified the .22-caliber semi-automatic handgun in court as the gun defendant had in his possession near the end of February 1989. He stated that he and defendant shot the gun in defendant's apartment near the end of February 1989, and that, subsequently, on July 4, 1989, he had witnessed defendant shooting the gun at a tree in front of the 4302 South Honore building.

Parejko also testified that defendant had admitted to him that he had killed Yvonne. He stated that he told Detective Kill about the admission on November 29, 1989, after defendant had been arrested. He asserted that he had not informed the police earlier about defendant's admission even though he had been interrogated at the police station about Yvonne's disappearance on November 27 and 28 because defendant had threatened to kill him, Lucille Werner and her daughter if he told anyone.

Apparently, on November 29, 1989, while in defendant's apartment with Detective Kill, Parejko described defendant's handgun and told Kill that Lucille's license plate SM 1972 had been stolen off her vehicle sometime after January 1989. He also told Kill that, several days after he and defendant had shot the Jennings semi-automatic handgun in defendant's apartment, defendant invited him to his apartment for coffee. According to Parejko, defendant then told him that he knew Yvonne was not coming back because he had

killed her by taking her into the bedroom, covering her with a quilt and shooting her four times. Parejko stated that he had not believed defendant. In his signed statement to the police, Parejko asserted that defendant said to him: "I covered her with a comforter and shot her four or five times." Parejko testified to the same story in front of the grand jury.

James Treacy, a firearms examiner with the police crime lab, testified that he examined four bullets and bullet fragments sent to him by the medical examiner's office. He determined that all four bullets were fired from the same weapon and were .22-caliber long rifle bullets. He also examined and test fired the Jennings .22-caliber handgun submitted to him by the police. In his opinion, it was a possibility—but not a certainty—that the recovered bullets had been fired from the .22 Jennings. He also examined the discharged cartridge that had been recovered from the wall in defendant's apartment. According to Treacy, this cartridge, however, was not fired from the submitted handgun. He also stated that the .22 Jennings semi-automatic handgun was a common handgun and that thousands of this model are available on the market.

Christine Braun, a forensic serologist with the Chicago police department, testified that, on November 29, 1989, she examined defendant's apartment. She stated that she discovered bloodstains of human origin in the kitchen, bedroom, spare bedroom and hallway. According to Braun, blood on the kitchen ceiling and on paper recovered from the floor of the bedroom was blood type O. The blood she discovered under the kitchen table, on a bedroom mattress, and on the spare bedroom window, window frame and curtain was blood type B. She testified that the blood in the area of the window was consistent with a splatter pattern. She could not determine, however, the age of the blood and it could have been months or years old. Braun also did not observe any pools of blood in defendant's apartment nor did she discover any blood on the comforter or on a black jacket which had belonged to Yvonne. She also did not perform any enzyme tests on the blood discovered in the apartment because the blood from the victim which she obtained from the medical examiner's office was too degraded to make any comparison possible. She also stated that only 9% of the white population has type B blood.

Detective Kill testified that, during his investigation, he spoke to defendant at the police station and asked him if there was any blood in his apartment. Defendant said there was none. After blood was discovered in his apartment, Kill asked defendant to explain its presence. According to Kill, defendant told him that there might be

blood in the kitchen because that was where he and Yvonne would shoot narcotics and sometimes the blood would spurt all over the ceiling, drapes, table and floor. Kill also stated that defendant told him that, if he were going to kill Yvonne, he would use a "backhoe" rather than bury her in a sewer. Additionally, Kill testified that, on November 29, 1989, while he was searching defendant's apartment, Parejko informed him that defendant had admitted to Parejko that he killed Yvonne. He then drove Parejko to the police station where Parejko signed a written statement.

After defendant's motion for a directed verdict was denied, defendant presented his case in chief. Defendant declined to testify on his own behalf. The parties then entered a number of stipulations into the record. It was stipulated that Yvonne had a criminal case pending in December 1988, that a $2,000 bond was posted on January 20, 1989, that Yvonne appeared in court at 26th and California on January 23, 1989, that, while in court, she overdosed on cocaine and was transported by paramedics to the hospital and that she was released to defendant later that day. It was also stipulated that, if Detective Charles Freed were called by the defense to testify, he would state that Kelsay told him that he had given two asbestos removal bags to defendant, that his girl friend may have given defendant several more bags, and that, although he did not include it in his report, Donald Busse told him that defendant had offered to kill Yvonne and her mother for $5,000. It was further stipulated that, if the defense called Detective Kill to testify, he would state that defendant had told him that Yvonne had been picked up on 47th street by a black male, that this black male had forced her to engage in anal sex, and that this same black male had come back and Yvonne had gone with him.

Finally, William Sherlock, an examiner with the police crime lab, testified that he examined three asbestos removal bags: one had been taken from Kelsay, one was inventoried from defendant's apartment, and the third was from the medical examiner's office. Sherlock determined that the three bags were from different sources or rolls. Additionally, he concluded that certain pliers recovered from defendant's apartment were *not* used to cut the wire coat hangers which had been fastened around the victim's hands and ankles. In his opinion, the coat hangers had broken by being twisted back and forth.

Following closing arguments and deliberations, the jury found defendant guilty of first-degree murder and concealment of a homicidal death. Defendant's motion for a new trial was denied.

At sentencing, the State urged that defendant be adjudged a ha-

bitual offender and, accordingly, be sentenced to natural life imprisonment pursuant to section 33B—1 of the Criminal Code of 1961. (Ill. Rev. Stat. 1991, ch. 38, par. 33B—1 (now 720 ILCS 5/33B—1 (West 1992)).) The State also asserted that a sentence of natural life was appropriate because defendant's offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The State then introduced defendant's two prior rape convictions. Assistant State's Attorney Alison Perona also testified that defendant had been charged with armed robbery in connection with a bank holdup at Citicorp Bank at 1751 West 47th Street on January 29, 1989. Perona testified that she spoke with defendant on November 29, 1989, and that he had told her that he robbed the bank in order to get money to bail Yvonne out of jail. She stated that he told her that he had borrowed a .22-caliber Jennings handgun from a friend in order to rob the bank. Perona admitted, however, that she had not included in defendant's written statement, which he ultimately refused to sign, the fact that defendant entered the bank with a gun. Additionally, she acknowledged that nobody at the bank ever saw a gun.

In mitigation, the defense asserted that defendant had been kicked out of his house at the age of 14, and that, since that time, he had worked very hard as a truck driver to make a living. Additionally, it was introduced that defendant suffered from a thyroid condition. Defendant also spoke on his own behalf. He maintained his innocence, asserted that he and Yvonne had enjoyed a "beautiful relationship," and denied robbing a bank. He also stated that he worked very hard, had a deteriorating mental condition which had resulted in his losing over 100 pounds, and was not a violent person.

The trial judge then sentenced defendant to consecutive sentences of natural life in prison for first-degree murder and five years in prison for concealment of a homicidal death. The natural life sentence was pursuant to section 33B—1 and the fact that defendant's offense was indicative of brutal and heinous behavior.

Defendant filed this timely appeal.

Defendant's first contention on appeal is that the elicitation of highly prejudicial testimony by the prosecutor constituted reversible error and denied him due process. Specifically, defendant asserts that, during the State's direct examination of Charles Kelsay, the prosecutor improperly, although unintentionally, elicited from Kelsay that defendant had told him he "was going to rob a bank" in order to get the money to bail Yvonne out of jail. Prior to trial, the judge had granted a defense motion which sought to bar any reference to an armed robbery which defendant had allegedly committed.

Defendant contends that this testimony of another offense was so prejudicial that his conviction must be reversed.

In order to preserve an issue for appellate review, a defendant must make a contemporaneous trial objection and renew that objection in a timely written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) Defendant failed to include this issue in his written post-trial motion and, therefore, has waived review of this question.

■ Notwithstanding waiver, however, this error was sufficiently cured by the trial judge and, therefore, was not so prejudicial as to deny defendant due process. A review of the transcript illustrates that the elicitation of this testimony was purely unintentional and surprised the State as much as it did the defense. Additionally, Kelsay's comment was that defendant said he was going to rob a bank; it was not that, in fact, he had robbed a bank. Moreover, the error was not dwelled upon and, as the trial judge stated later when he denied the defense motion for a mistrial, "was dealt with quickly and appropriately, and no undo [*sic*] highlight was given to it at all." Finally, the trial judge offered to strike the answer and admonish the jury, but the defense declined. Based on the record, we agree with the trial judge that this error was harmless beyond a reasonable doubt. Additionally, the defense objected and that objection was sustained by the trial judge. Generally, when an objection is promptly sustained by the trial judge, any prejudice is cured. *People v. Everette* (1991), 220 Ill. App. 3d 453, 457, 581 N.E.2d 109, 111.

Defendant maintains, however, that this error was compounded when the prosecutor told the jury while reading a stipulation that the police recognized the anonymous caller's voice as that "of a male white individual." According to defendant, this intimated to the jury that defendant was the caller. First, every witness against defendant in this case was "a male white individual." Additionally, the facts of the case show that Yvonne had been murdered approximately 10 months previously. It would be contrary to human nature for a murderer whose crime has gone undetected for almost a year to make an anonymous tip to the police, notify them of the crime, tell them the location of the body, and then direct them to his own building. It is quite a stretch to reason that this comment intimated to the jury that defendant was the tipster and an even greater leap to maintain that this error was prejudicial.

Additionally, and most importantly, after the State erroneously made this comment, defendant objected, the court held a sidebar, and the parties agreed that the appropriate way to cure the error was to start the stipulation over from the beginning without reference to

the fact that the voice was that of a "white" individual. Thus, any error was cured by the trial court.

Additionally, defendant asserts that several other "grave errors" occurred. Specifically, he asserts that Detective Kill's testimony that, during his investigation, he checked defendant's Chicago police department identification number and his FBI number and Detective Ptak's testimony that he "knew" defendant was "totally inadmissible and highly prejudicial." He asserts that this testimony further informed the jury that defendant was a criminal. At trial, however, defendant did not deem this testimony prejudicial enough to make an objection and, therefore, pursuant to *Enoch*, has waived review of these comments.

Defendant's second contention on appeal is that the trial judge denied him his right to a fair trial when he allowed the State to elicit additional highly prejudicial testimony. Specifically, defendant argues that the trial judge committed reversible error when he denied his motion to bar the State from eliciting testimony from Donald Busse that defendant had offered to kill Yvonne and Jeanette for $5,000. He asserts that, since he was not accused of committing an offense against Jeanette or of committing the murder for money, this testimony merely evidenced his propensity to commit other crimes and its prejudicial impact outweighed any probative value.

Threats made by a defendant against a victim prior to a criminal act against that victim are admissible to show malice and criminal intent. (*People v. Williams* (1980), 85 Ill. App. 3d 850, 856, 407 N.E.2d 608, 613.) Generally, however, threats by a defendant against a third party are not admissible unless " 'the connection between them and the deceased is such that under certain circumstances the threats would import harm to or hostility toward the deceased.' " (*Williams*, 85 Ill. App. 3d at 856, 407 N.E.2d at 613, quoting *People v. Scott* (1918), 284 Ill. 465, 474, 120 N.E. 553, 556.) In other words, the threat must be "linked" to the victim in some way. (*Williams*, 85 Ill. App. 3d at 856, 407 N.E.2d at 613.) Additionally, the mere fact that certain evidence which is admissible and offered for a proper purpose may also tend to evidence a defendant's character and propensity to commit other crimes does not make that evidence inadmissible. *People v. Illgen* (1991), 145 Ill. 2d 353, 375, 583 N.E.2d 515, 524.

In *Williams*, the victim's mother testified that, $1^1/_2$ months prior to the murder, defendant told her "something about his stomach burning and he had to get revenge." Several years prior to the killing, the victim in *Williams* had stabbed the defendant in the stomach causing him to require a colostomy. The *Williams* court held that the statement was admissible because "the language used and the cir-

cumstances under which it was used were broad enough to include the victim within its terms." (85 Ill. App. 3d at 856.) The court also stated that the prior threat was admissible because the relationship between the statement and the victim was "so strong as to import harm or hostility toward the victim." 85 Ill. App. 3d at 857.

■ In our opinion, if the statement in *Williams* was admissible, then defendant's threat in this case is clearly admissible. In this case, according to Busse, defendant offered to kill Yvonne just one month prior to her disappearance for $5,000. This was an explicit threat against the victim and not just "broad enough to include the victim within its terms" as was the case in *Williams*. The threat demonstrated that defendant felt malice toward the victim and also showed that defendant could form the requisite intent for murder. The fact that he also offered to kill Jeanette and asked for $5,000 in payment does not change the fact that the threat clearly "import[ed] harm or hostility toward the victim" and was admissible to show malice and criminal intent.

Thus, this statement was clearly relevant and admissible and whether it was more prejudicial than probative, thus justifying its exclusion, was a question for the trial judge to make in the exercise of his discretion. (*Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 461, 605 N.E.2d 493, 505; *Illgen*, 145 Ill. 2d at 375, 583 N.E.2d at 524.) In our opinion, defendant has failed to show that the trial judge clearly abused his discretion and we cannot say, as a matter of law, that the probative value of this relevant and admissible evidence was substantially outweighed by its prejudicial effect.

Defendant's third contention on appeal is that he was denied a fair trial when, during jury selection, the trial judge allowed the State to excuse veniremembers Mayo Loving, Marsheila Hall and James Kohl for cause over defense objection "merely on the bases of rap sheets." He maintains that the judge should have questioned these jurors further about the "omissions" in their answers on their jury cards. Defendant asserts, without citations to authority, that "[i]t is simply not disqualifying to have been an accused or convicted, and, absent sufficient inquiry, to fail to disclose the fact because these omissions might have been purely inadvertent."

The purpose of *voir dire* examination is "to assure the selection of an impartial jury" (*People v. Teague* (1982), 108 Ill. App. 3d 891, 894, 439 N.E.2d 1066, 1068) because the defendant's right to a jury trial means the right to be tried by a panel of unbiased and unprejudiced jurors. (*People v. Cole* (1973), 54 Ill. 2d 401, 411, 298 N.E.2d 705, 711.) A violation of this right mandates reversal. (*Cole*, 54 Ill. 2d at 411, 298 N.E.2d at 711.) Under Supreme Court Rule 234 (134 Ill. 2d

R. 234) and Supreme Court Rule 431 (134 Ill. 2d R. 431), the trial judge has the primary responsibility of conducting the *voir dire* examination in criminal cases (*Teague*, 108 Ill. App. 3d at 894, 439 N.E.2d at 1068-69) and the scope, extent, and manner of the questioning rest within his broad discretion. (*People v. Porter* (1986), 111 Ill. 2d 386, 401, 489 N.E.2d 1329, 1335; *People v. Brandon* (1987), 157 Ill. App. 3d 835, 841, 510 N.E.2d 1005, 1009.) Additionally, the determination of whether a prospective juror "possesses the state of mind which will enable him to give to an accused a fair and impartial trial" also rests in the judge's sound discretion and his determination will not be disturbed unless it is against the manifest weight of the evidence. (*Cole*, 54 Ill. 2d at 414, 298 N.E.2d at 712.) In order for a judge to have abused his discretion in limiting the scope of inquiry during *voir dire*, however, it must be clear to the reviewing court, after reviewing the record, that his refusal to ask a defendant's tendered questions "thwarted the selection of an impartial jury" (*Teague*, 108 Ill. App. 3d at 894, 439 N.E.2d at 1069) by denying defendant the opportunity to probe relevant areas of potential bias and, thus, restricting his ability to intelligently exercise his challenges. *Porter*, 111 Ill. 2d at 401, 489 N.E.2d at 1335.

■ In this case, the trial judge conducted the *voir dire* and based his questioning upon the jury card questions and answers. One question on the jury card read: "Have you ever been an accused, complainant, or a witness in a criminal case?" Loving, Hall, and Kohl all answered "no" to the question. Based on other answers, however, the State obtained "rap sheets" on these three veniremembers. In fact, Loving had received probation for burglary and supervision for theft, Hall had received supervision for a theft, and Kohl had been convicted of theft. The State requested that all three jurors be excused for cause because they lied on their jury cards. The defendant objected. Defendant did not argue at the time and he does not argue here that Hall, Loving, and Kohl had not been accused or convicted of prior offenses; he merely asserted that they should be questioned further because they might have some sort of explanation for their responses. In overruling defendant's objection, the trial judge stated:

> "I highlighted that the question calls for an answer to all three of those situations.
>
> The question is set forth clearly, and these folks clearly set forth the answer was no. They've been sworn to tell the truth, and they haven't. So, I don't think the Court has to get into collateral trials on these issues, and the request for cause on those will be granted."

As stated above, both the scope and extent of *voir dire* questioning and the determination whether a particular veniremember possesses the state of mind required to carry out his or her duties as a juror lie within the sound discretion of the trial judge. These potential jurors swore to tell the truth and, in the trial judge's opinion, failed to do so. After a review of the record, we cannot say that the trial judge's decision to excuse these jurors for cause because they "lied" on their jury cards was against the manifest weight of the evidence or that he abused his discretion by refusing defendant's request that these jurors be questioned further on their failure to answer the question properly.

The cases defendant cites are distinguishable. In *Gray v. Mississippi* (1987), 481 U.S. 648, 95 L. Ed. 2d 622, 107 S. Ct. 2045, during *voir dire* questioning in a capital murder trial, a juror, although initially confused in her response, stated that she could reach a guilty verdict and vote to impose the death penalty. The trial judge then excused her for cause on the prosecutor's motion. The United States Supreme Court reversed, holding that, since she was clearly qualified to sit as a juror in a capital case, the trial court was not authorized to excuse the juror for cause.

This is not a capital case, however, and the prospective jurors were not excused because they were slightly confused before unequivocally answering a *voir dire* question. These prospective jurors failed to correctly answer a clear and straightforward question which the trial judge "highlighted" when he conducted the *voir dire*. Additionally, we note that the other cases defendant cites are distinguishable because this is not a case where a trial judge's failure to ask certain questions during the *voir dire* examination denied the defendant a fair opportunity to discover any potential areas of bias or prejudice among prospective jurors and resulted in prejudiced jurors being empaneled. See *Porter,* 111 Ill. 2d at 401, 489 N.E.2d at 1335; *People v. Mitchell* (1984), 121 Ill. App. 3d 193, 194-95, 459 N.E.2d 351, 353.

Defendant's fourth contention on appeal is that he was prejudiced by prosecutorial misconduct during closing argument. Specifically, defendant asserts that he was denied a fair trial when the prosecutor argued during closing argument that, in order to find defendant not guilty, the jury would have to conclude that all of the State's witnesses were lying. He argues that, on the contrary, the jury could have acquitted him without concluding that the State's witnesses were all untruthful.

Generally, it is improper for a prosecutor to argue to a jury during closing argument that it would have to find that all of the

State's witnesses lied in order to find defendant not guilty because, in many cases, a jury could return a not guilty verdict based upon the insufficiency of the evidence without believing that every witness for the State failed to tell the truth. (*People v. Roman* (1981), 98 Ill. App. 3d 703, 708, 424 N.E.2d 794, 798.) However, it is also established that a prosecutor is given "wide latitude" to comment on the evidence during closing argument and his remarks will not be considered improper " 'if they are based upon facts in the record or reasonable inferences drawn therefrom.' " (*People v. Jones* (1992), 240 Ill. App. 3d 213, 225, 608 N.E.2d 266, 275, quoting *People v. Batson* (1992), 225 Ill. App. 3d 157, 166, 587 N.E.2d 549, 554.) Additionally, comments which are invited by a defense argument and are not prejudicial also do not constitute error. (*People v. Franklin* (1990), 135 Ill. 2d 78, 100, 552 N.E.2d 743, 753.) Moreover, a trial judge's determination as to the propriety of the prosecutor's arguments will not be disturbed absent a clear abuse of discretion. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970, 976.) In order for improper prosecutorial remarks to mandate reversal of a conviction, "the complained-of remarks must have resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different." *Cisewski*, 118 Ill. 2d at 175, 514 N.E.2d at 976.

Defendant objects to the following remarks made by the prosecutor to the jury during closing argument:

> "They want you to somehow find him not guilty because everybody is lying. Don Busse is lying. Joe Parejko is lying. Rory Compton is lying. Chuck Kelsay is lying.

* * *

> They are saying all those witnesses are bold-faced liars."

The trial judge overruled defendant's objection on the ground that it was "invited comment" because defendant challenged the credibility of the State's witnesses in his closing argument.

■ We agree with the trial judge that the prosecutorial comments at issue here were not improper. Contrary to defendant's assertion, the prosecutor did not argue to the jury that, in order to acquit defendant, it would have to find that all of the State's witnesses lied. He argued that the defendant wanted the jury to believe that all of the State's witnesses lied and the prosecutor asserted that such a conclusion would be ludicrous. As such, his comments were clearly invited by defendant's argument and were not prejudicial.

Defendant also argues that the prosecutor mischaracterized the evidence during closing argument when he asserted that defendant was "talking about the threat that he had made to Yvonne" when he obtained the gun from Compton. According to defendant, Compton

only testified that defendant requested the gun because he wanted to protect himself from Yvonne's pimps.

Compton also stated to the police, however, that defendant had said that he was upset with Yvonne because she kept getting arrested. Compton further testified that defendant had told Yvonne that, if she got arrested again, he was going to get rid of her. It is not unreasonable to infer from this statement that defendant meant to "get rid of Yvonne" by killing her with the gun he obtained from Compton. Thus, this prosecutorial remark was not a mischaracterization of the evidence, but rather a legitimate inference arising from the facts in the record.

Defendant's fifth contention on appeal is that he was denied a fair trial when the judge improperly excluded evidence favorable to him. Specifically, defendant asserts that the judge improperly excluded the content of Yvonne's love letters as hearsay. He asserts that the content of the letters was probative and relevant evidence offered to show his state of mind and, as such, not hearsay.

Hearsay is any out-of-court statement offered to prove the truth of the matter asserted therein and is inadmissible. (*People v. Bollman* (1987), 163 Ill. App. 3d 621, 633, 516 N.E.2d 870, 877.) Out-of-court statements offered to prove their effect on a listener's mind or to show why the listener subsequently acted as he or she did are admissible as nonhearsay. (*Bollman*, 163 Ill. App. 3d at 633, 516 N.E.2d at 877.) An erroneous exclusion of admissible evidence as hearsay will not mandate reversal, however, unless the defendant was prejudiced thereby and the error affected the verdict. *People v. Thomas* (1991), 222 Ill. App. 3d 1051, 1055, 584 N.E.2d 1030, 1032.

A review of the record shows that the State had Officer Ptak identify the letters as being those which he recovered from defendant's bedroom. The State introduced the letters for purposes of "identification" and, thus, did not attempt to admit the content of the letters into evidence. The defendant, however, requested that the court allow the letters to go back to the jury room during deliberations for the purpose of showing that defendant and Yvonne had a good relationship and cared about each other and, therefore, defendant would not have killed her. The trial judge denied defendant's request on the grounds that the content of the letters was both irrelevant and hearsay.

■ First, the trial judge erred in excluding the content of the letters as hearsay. These letters were written by Yvonne and addressed to defendant. As such, they were not being offered for the truth of the matter asserted therein, namely that Yvonne cared for defendant and wanted him to bail her out of jail. They were being

offered to show that defendant cared for Yvonne, that they had a good relationship and that, therefore, he would not have killed her.

The content of the letters, however, does not tend to show defendant's state of mind or the reason for his subsequent actions, either. In the very few cases cited by defendant, out-of-court statements were offered to prove that defendants' actions were caused by hearing the statements. (See *People v. Quick* (1992), 236 Ill. App. 3d 446, 603 N.E.2d 53; *People v. Algee* (1992), 228 Ill. App. 3d 401, 591 N.E.2d 1001.) In other words, the defendants wanted to show that their actions were the direct result of the statements' effect on their state of mind. In this case, however, the defendant was not attempting to show that a specific action was the direct result of reading the content of the letters. On the contrary, he wanted the content admitted in order to imply that he did not take a certain action, namely, murdering Yvonne.

The question we must answer then is whether this evidence was relevant and whether its exclusion prejudiced defendant. "Relevant evidence" is evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (*People v. Stewart* (1984), 105 Ill. 2d 22, 54, 473 N.E.2d 840, 856.) Additionally, it is for the trial court to determine if evidence is relevant and admissible, and its decision will not be disturbed absent a clear abuse of discretion which results in manifest prejudice to the defendant. *People v. Hayes* (1990), 139 Ill. 2d 89, 130, 564 N.E.2d 803, 820.

The trial court did not abuse its discretion in excluding this evidence as irrelevant. Additionally, in light of the fact that defendant was still able to argue to the jury that the fact of the love letters showed that he and Yvonne had a good relationship and, therefore, he would not have killed her, defendant was not prejudiced and the result of the trial would not have been different solely if the jury had read Yvonne's letters. See *Thomas*, 222 Ill. App. 3d at 1055, 584 N.E.2d at 1032.

Defendant's sixth contention on appeal is that the publication of three morgue photographs to the jury denied him his right to a fair trial. He asserts that the prejudicial effect of the photographs substantially outweighed any probative value because they contributed nothing to understanding the cause of death and did not supplement the testimony of the State's witnesses in any way.

Photographs of a deceased victim are admissible if they tend to establish any fact in issue or any element of the crime charged "in spite of the fact that they may be of a gruesome or disgusting nature."

(*People v. Lucas* (1989), 132 Ill. 2d 399, 439, 548 N.E.2d 1003, 1019.) Additionally, when a defendant pleads not guilty, the State has the right to establish every element of the charged offense and every relevant fact, even if those facts were stipulated to by the defendant. (*People v. Henderson* (1990), 142 Ill. 2d 258, 319, 568 N.E.2d 1234, 1263.) In *Henderson,* the Illinois Supreme Court listed the following as valid reasons for admitting photographs of a decedent:

> "[T]o prove the nature and extent of injuries and the force needed to inflict them; the position, condition, and location of the body; the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness. [Citations.]" *Henderson,* 142 Ill. 2d at 319-20, 568 N.E.2d at 1263-64.

If a photograph's nature is so prejudicial that it is "likely to inflame the jurors' passions," however, the photograph should not be allowed into evidence (*Henderson,* 142 Ill. 2d at 319, 568 N.E.2d at 1263) as is the case when the photograph not only shows the victim's wounds, but also "grisly autopsy details" which do not shed any light on any disputed issue. (*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 330, 559 N.E.2d 948, 958.) It is the responsibility of the trial judge to determine whether the prejudicial effect of certain photographs substantially outweighs any probative value they may have and the judge's decision will not be disturbed on appeal except upon a clear showing of abuse and prejudice. *Lucas,* 132 Ill. 2d at 439, 548 N.E.2d at 1019; *People v. Shum* (1987), 117 Ill. 2d 317, 353, 512 N.E.2d 1183, 1196-97.

In this case, the trial court only allowed 3 of 13 photographs of the victim to go back to the jury room. He specifically found that these three photographs were probative because they showed the victim's gunshot wounds, the entry points of the bullets, and their location in the victim's body. One photograph also showed a portion of the victim's tattoo. The judge did not allow the morgue photographs which showed the body's severe decomposition and skeletalization to be published to the jury or the photographs which showed the victim's hands and feet bound by coat hangers.

Although the pictures which the jury was permitted to view were "gruesome," even more disgusting photographs have been admitted in some cases. (See *People v. Lindgren* (1980), 79 Ill. 2d 129, 143, 402 N.E.2d 238, 245.) The photographs in this case clearly were probative of the nature of the victim's injuries and the manner and cause of her death. They also were probative as aids to the jury in understanding the testimony of Dr. Kirschner, the medical examiner, and as corroboration of the identification testimony of Jeanette. None of

these photographs were like those rejected in *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827, where the testimony established that there was little superficial evidence of fatal injuries on the body, yet the gruesome nature of the morgue photographs allowed into evidence was caused almost entirely by the autopsy procedures. Unlike in *Lefler*, the photographs here did not mislead the jury as to the nature of the injuries nor did the State offer them for the principal purpose of arousing prejudicial emotions in the jurors. They were extremely probative and minimally prejudicial and the trial judge properly exercised his discretion in allowing them to be published to the jury.

Defendant's seventh contention on appeal is that he was not proven guilty beyond a reasonable doubt. In support of this contention, he points out inconsistencies and contradictions in the testimony of the State's witnesses.

Defendant's argument is essentially an attack on the credibility of the witnesses. Resolving conflicts in testimony, weighing the evidence and assessing the credibility of witnesses, however, are uniquely the responsibility of the jury. (*People v. Mejia* (1993), 247 Ill. App. 3d 55, 62, 617 N.E.2d 799, 804.) A jury may believe as much or as little of a witness's testimony as it pleases. (*Mejia*, 247 Ill. App. 3d at 62, 617 N.E.2d at 804-05.) Consequently, after a defendant has been convicted, the reviewing court must look at all the evidence in the light most favorable to the prosecution and determine "whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Wicks* (1992), 236 Ill. App. 3d 97, 111, 603 N.E.2d 594, 603.) "This standard is used because it is not for the reviewing court to substitute its judgment for the judgment of the jury, who heard the evidence and observed the witnesses." *Wicks*, 236 Ill. App. 3d at 111, 603 N.E.2d at 603.

After reviewing the evidence in the light most favorable to the prosecution, we cannot say that no rational trier of fact could have convicted defendant of murder beyond a reasonable doubt. The jury was not required to view the testimony of the State's witnesses with the same skepticism as did the defendant and, as stated above, could believe or discard as much or as little of a witness' testimony as it desired. Although the evidence also could have supported the conflicting inference that defendant was innocent and one of his neighbors actually perpetrated the offense, this does not mean that defendant was not proven guilty beyond a reasonable doubt. (See *People v. Campbell* (1992), 146 Ill. 2d 363, 380, 586 N.E.2d 1261, 1268.) Where two conflicting hypotheses are supported by the evidence and the jury makes its decision between the two, it would be improper for

us to disturb that determination. (See *United States v. Keck* (7th Cir. 1985), 773 F.2d 759, 769.) Accordingly, we hold that the evidence was sufficient to support a verdict of guilty beyond a reasonable doubt of first-degree murder.

Defendant's eighth contention on appeal is that section 33B—1 of the Criminal Code of 1961 (the Act) (Ill. Rev. Stat. 1991, ch. 38, par. 33B—1 *et seq.* (now 720 ILCS 5/33B—1 *et seq.* (West 1992))) is unconstitutional. According to section 33B—1 of the Act, any person who is convicted for a third time of a Class X felony shall be adjudged a habitual offender and, except where the death penalty is imposed, "shall be sentenced to life imprisonment." (Ill. Rev. Stat. 1991, ch. 38, par. 33B—1(e) (now 720 ILCS 5/33B—1(e) (West 1992)).) Defendant asserts that this Act violates article I, section II, of the Illinois Constitution, due process of law, and the eighth amendment because it requires the imposition of a natural life sentence of imprisonment while forbidding other constitutional considerations such as the seriousness of the offense and the defendant's rehabilitative potential. He also maintains that the Act violates the separation of powers provision of the Illinois Constitution and the eighth amendment to the United States Constitution because it vests too much discretion in the hands of the prosecutor.

Numerous appellate courts have rejected the same arguments defendant advances here and have upheld the constitutionality of the Act. (*People v. Smith* (1994), 256 Ill. App. 3d 610; *People v. Wilson* (1994), 257 Ill. App. 3d 826; *People v. Franzen* (1989), 183 Ill. App. 3d 1051, 1058-59, 540 N.E.2d 548, 553; *People v. Westefer* (1988), 169 Ill. App. 3d 59, 65, 522 N.E.2d 1381, 1386; *People v. Morissette* (1986), 150 Ill. App. 3d 431, 443-44, 501 N.E.2d 781, 789-90; *People v. Hartfield* (1985), 137 Ill. App. 3d 679, 691, 484 N.E.2d 1136, 1144; *People v. Mc-Neil* (1984), 125 Ill. App. 3d 876, 881, 466 N.E.2d 1058, 1061-62; *People v. Washington* (1984), 125 Ill. App. 3d 109, 115-16, 465 N.E.2d 666, 670-71.) We agree with the rationale and conclusion of these cases and, therefore, will not prolong this opinion with a lengthy reconsideration of these issues. Additionally, we note that these questions have been presented to the Illinois Supreme Court in *People v. Knott*, Nos. 73286 and 73340, consolidated, and its decision is currently pending.

Defendant's final contention on appeal is that he was improperly sentenced to natural life imprisonment because his conduct was not exceptionally brutal or heinous. According to the Unified Code of Corrections, a court can sentence a defendant to natural life imprisonment if the court finds that the defendant's conduct "was accompanied by exceptionally brutal or heinous behavior." (Ill.

Rev. Stat. 1991, ch. 38, par. 1005—8—1 (now 730 ILCS 5/5—8—1 (West 1992)).) In light of the fact that we have found the Act to be constitutional, this contention is irrelevant and we decline to address it.

Accordingly, for the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

O'CONNOR and MANNING, JJ., concur.