NOTICE
Decision filed 06/26/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230098-U

NO. 5-23-0098

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 19-CF-211 |
| | ) | |
| DENZEL R. ALDRIDGE, | ) | Honorable |
| | ) | Charles C. Hall, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Sholar and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court properly conducted a *Krankel* inquiry and the circuit court's merit determination was not manifestly erroneous. The circuit court's refusal to excuse a juror for cause was not against the manifest weight of the evidence, and the circuit court's decision to deny the request for additional peremptory challenges was not an abuse of discretion.

¶ 2    A jury convicted the defendant, Denzel R. Aldridge, of first degree murder and unlawful possession of a weapon by a felon. The defendant was sentenced to 80 years in the Illinois Department of Corrections (IDOC) for first degree murder, a consecutive 5-year sentence for unlawful possession of a weapon by a felon, and he received 3 years of mandatory supervised release (MSR). On appeal, the defendant claims that the circuit court erred in rejecting the defendant's *pro se* claims of ineffective assistance of counsel, and further claims that the circuit

1

court erred in failing to strike a juror for cause and in failing to allow an additional peremptory strike. For the following reasons, we affirm the judgment of Vermilion County.

¶ 3                                      I. BACKGROUND

¶ 4      During the afternoon of April 24, 2019, the defendant was standing outside near Netta's convenience store and the Fair Oaks housing complex in Danville, Illinois, with a group of people. Roosevelt Anderson walked through the housing complex that afternoon and was confronted by an individual that had been with the defendant's group. The defendant and others joined the confrontation, and they attempted to take Anderson's firearm away from him. The defendant pulled out his own gun and shot and killed Anderson. The defendant was subsequently charged by information with multiple counts of first degree murder (720 ILCS 5/9-1(a) (West 2018)) and two counts of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1 (West 2018)).

¶ 5      During *voir dire*, a prospective juror, Nancy Konieczki, who was a high school teacher, disclosed that she had taught a potential witness, Jason Jeffries, approximately 15 years prior. Konieczki had family members who were police officers, but she was not related to any witnesses in this case. Konieczki indicated that she would be able to be a fair and impartial juror, and she had no knowledge of Jeffries that would cause her to be biased or prejudiced. The State additionally questioned Konieczki about a note on her questionnaire where Konieczki had disclosed that her daughter had passed away several months prior to trial. The following questioning of Konieczki occurred:

> "STATE: I hate to bring this up, but there was a note on your questionnaire about your daughter.
> KONIECZKI: Yes. She passed away several months ago.
> STATE: I am very, very sorry to hear that. Is that going to make it difficult for you to sit on this jury?
> KONIECZKI: I honestly don't know. I mean grief is awful, but like today I'm okay, but…
> STATE: Obviously that's going to be on your mind probably forever.

2

KONIECZKI: Right. Right."

¶ 6      The circuit court had also asked questions during *voir dire* to all of the potential jurors, including whether there was anything about the nature of the charges of first degree murder and unlawful use of a weapon by a felon that would affect their ability to be fair and impartial, or cause them to be biased or prejudiced. The circuit court additionally asked the potential jurors if there was any reason, whether it was asked about or not, that they could not be fair and impartial. Konieczki did not indicate that she would have been affected by the nature of the charges or that she could not be fair and impartial.

¶ 7      Defense counsel sought to strike Konieczki for cause after using all of his peremptory strikes. The circuit court considered that Konieczki did not indicate that she was unable to be fair or impartial or that she was biased or prejudiced but allowed the defendant to present additional argument on cause. The defense argued that the case was a murder case, and that Konieczki had recently lost her daughter and was still experiencing grief. Defense counsel noted that Konieczki "was fine today" but she gave the impression that she may have issues during the trial. Defense counsel acknowledged that further questioning of Konieczki was inappropriate as the grief Konieczki was experiencing and how it affected her would not be discovered through additional questioning. The State argued that Konieczki had not indicated that she could not be fair.

¶ 8      The circuit court denied the defendant's motion to strike Konieczki and reasoned "she didn't say that it would affect her ability to be fair and impartial or that it would cause her to be biased and prejudiced." The circuit court believed that Konieczki was honest about the fact that she was going to suffer from grief, but that was not enough to demonstrate that she would not be able to be a fair and impartial juror.

¶ 9 After the jury was selected, the parties presented opening statements. During the defendant's opening statement, defense counsel conceded that the defendant had possessed a firearm. Defense counsel further claimed that Anderson also had a firearm, and that defendant shot Anderson in self-defense and the defense of others.

¶ 10 The State presented Jessica Driver, Anderson's girlfriend and the mother of Anderson's child, as its first witness. Driver lived with Anderson, and she testified that she had a conversation with Anderson on the morning of April 24, 2019. Driver identified a photograph of Anderson, and the photograph was admitted into evidence without objection. The State additionally questioned Driver on whether Anderson owned a firearm, and the following transpired:

> "STATE: And when he left the house that day, do you know if he had a gun on him?
> DRIVER: No.
> STATE: Do you know if [Anderson] actually owned a gun?
> DRIVER: No, but he had a FOID card though.
> STATE: So you don't know if he actually had a gun—
> DRIVER: No.
> STATE: —outside of knowing he had a FOID?
> DRIVER: No, sir."

Defense counsel did not cross-examine Driver.

¶ 11 Cliff Hegg testified after Driver, and stated that on April 24, 2019, he was working for the Danville Police Department. Hegg was on patrol that afternoon and had received a call alerting him that a person had been shot at the Fair Oaks housing complex. When Hegg arrived at the scene, he found Anderson lying on the roadway face up. Anderson's eyes were open, and he was breathing, but unresponsive.

¶ 12 After Hegg testified, stipulated autopsy results were admitted into evidence and published to the jury. The autopsy examination had revealed a close-range gunshot wound on the entrance of Anderson's scalp, and the cause of death was "a gunshot wound to the head."

4

¶ 13    Patrick Carley, a detective with the Danville Police Department, testified that he investigated the shooting and helped execute a search warrant at an apartment at 911 Fowler Street. Carley assisted in the search of the apartment, including the upstairs bathroom where the firearm allegedly belonging to the defendant was located. Carley also testified that there were multiple cameras throughout the Fair Oaks housing complex property, and he was familiar with the surveillance video collected from the housing office on the date of the shooting.

¶ 14    Carley testified that he had reviewed a PowerPoint presentation with the State's Exhibits 14a through 14nn, that contained still images and videos clips, without audio, from the recorded video surveillance system on April 24, 2019. The PowerPoint presentation was published to the jury. Carley identified the defendant in the courtroom, and he was able to identify the defendant on the video images from the video surveillance of the Fair Oaks housing complex. The defendant could be seen in the images wearing a "white hoodie with the multiple designs on the back."

¶ 15    Carley testified that the defendant appeared in the Fair Oaks housing complex surveillance video footage on April 24, 2019. The defendant was shown standing across the street from Netta's convenience store with a group of people at 11:41 a.m. Carley also identified Tariq Wilson, Percy Freeman, and Tavares Mitchell as individuals who were standing in the group with the defendant.

¶ 16    Carley testified that a video clip from approximately 12:33 p.m. showed a gray Pontiac G6 pull into Netta's convenience store parking lot. Freeman left the defendant's group and entered the vehicle. Approximately an hour later, the gray Pontiac G6 was seen driving down Fowler Street. It stopped briefly next to Anderson, who was walking alone along the roadside. Anderson did not stop; he continued walking towards the Fair Oaks housing complex. A few minutes later, the gray Pontiac G6 returned to the Netta's convenience store parking lot, across the street from where the defendant was still standing with the group of people, which also included Wilson and Mitchell.

5

¶ 17    The surveillance video showed the Pontiac G6 stop, and the driver's door appeared to open slightly. Wilson took a few steps towards the vehicle. Then, the defendant, Wilson, and Mitchell left the group and multiple surveillance cameras depicted those three individuals running through the Fair Oaks housing complex property in different directions. The defendant was shown running into an apartment located at 911 Fowler Street. Shortly after the defendant entered the apartment, he exited the unit and, as he did so, he peeked around the building as if he was looking for someone.

¶ 18    At the same time, a different camera captured Anderson walking on a sidewalk through the middle of a courtyard in the Fair Oaks housing complex. Carley identified Freeman as the individual who was approaching Anderson on the same sidewalk. Mitchell was also walking on the sidewalk, but he was several feet behind Freeman. The defendant was walking on the lawn close to the apartment building several feet away and parallel to Freeman. When Anderson met Freeman on the sidewalk, Freeman stopped walking. At the same time, the defendant stopped and stood near an apartment door. Anderson continued walking past Freeman, without stopping, and Freeman turned around and followed Anderson. Anderson turned around once and then walked off the sidewalk into the grass away from Freeman until Anderson was out of view. Mitchell then walked towards the defendant. Another individual, who was wearing a gray hoodie, then appeared in the video surveillance. The defendant, Mitchell, and the individual in the gray hoodie then followed in the same direction as Freeman through the courtyard.

¶ 19    Carley then testified to the State's Exhibit 14ii, which was a video that began at 1:42 p.m. Anderson appeared in the video walking backwards as the defendant walked forward. The video depicted the defendant reaching towards Anderson's midsection. The individual in the gray hoodie, along with Freeman and Mitchell, then joined the defendant in an attempt to wrestle something away from Anderson. It was not clear at that point what the men were trying to get from

6

Anderson's midsection. Mitchell then walked away. While the person in the gray hoodie and Freeman continued to wrestle with Anderson, the defendant took a couple steps back and pulled out a firearm. The individual in the gray hoodie then began hitting Anderson, while Freeman continued to wrestle an unknown object from Anderson. The defendant then struck Anderson with his firearm and the person in the gray hoodie walked away. The defendant pointed his gun at Anderson, while Freeman continued to try to get something from Anderson. The video then showed Anderson falling to the ground as Freeman took the object, which appeared to be a gun. Freeman and the defendant ran off after Anderson hit the ground.

¶ 20     Carley identified that the defendant ran inside of the apartment located at 911 Fowler Street. Freeman ran into a parking lot at the housing complex and entered the passenger side of a car; the car drove away. This completed the introduction of the video surveillance footage from that day.

¶ 21     Jason Jeffries, a detective for the City of Danville Police Department, also testified as a witness for the State. On April 24, 2019, Jeffries secured the crime scene where Anderson was shot. He also processed evidence obtained from a search warrant of an apartment located at 911 Fowler Street. He had located, photographed, collected, and secured various items of evidence. Jeffries introduced photographs of the crime scene and photos of the objects he had secured. He collected a shell casing from the crime scene. From the apartment, he collected a white hooded NASA sweatshirt and athletic pants. Jeffries additionally collected a Sig Sauer P-238 .380-caliber pistol from the bottom of a trash can in the apartment located at 911 Fowler Street. Jeffries also testified that he had collected a loaded magazine that was found on Anderson.

¶ 22     James Schroeder, an inspector for the Vermilion County Housing Authority, also testified. Schroeder was working on a unit at the Fair Oaks housing complex on April 24, 2019. He saw four

people on the sidewalk approximately 20 feet from where he was repairing a screen door. One of the individuals was hunched over, holding something against his stomach, and saying, "No, No." The three other individuals were "trying to get whatever he had away from him." One person stepped away while the other two continued trying to take something from the hunched over person. Then, the person wearing a white hoodie with red dots stood back and raised a gun.

¶ 23    When Schroeder saw the gun, he went into the apartment and called 911. Once inside, Schroeder went into the bathroom and continued to watch the confrontation from the bathroom window. One person from the group ran away, and the person in the white hoodie started to hit "the gentleman that had the gun or whatever he had in his hand, down in his stomach," in the back of the head with the gun. The person who was being hit, "the whole time he had his hands gripped in his stomach and was bent over the whole time."

¶ 24    Schroeder then testified that the group moved behind his truck, which blocked his view. Schroeder remained on the phone with 911 and he heard a "very loud bang." Two men ran towards the courtyard, and Schroeder could see the legs of an individual on the ground past his truck. After a few minutes, Schroeder checked on the person who was on the ground and gasping for air. Schroeder further testified that he never saw the man hit anyone or extend his arms in a threatening way, and he kept saying "No." Schroeder clarified that he was inside so he could not hear everything that was said, but he could hear "No."

¶ 25    After the State rested, the defendant testified on his own behalf. The defendant testified that he was barred from the Danville Housing Authority and was not allowed on the Fair Oaks housing complex property. The defendant admitted that he was previously convicted of attempt armed robbery.

¶ 26    The defendant explained that on April 24, 2019, he was "hanging out" at the Fair Oaks housing complex and had a firearm with him. The defendant testified that before the confrontation, he was talking to Mitchell, when he had heard Freeman scream, "help." The defendant jogged in the direction of Freeman and saw him "tussling" with Anderson, who had a firearm. The defendant tried to help Freeman by grabbing the barrel of Anderson's gun and telling Anderson to stop. A person named "Moe" was watching, and then Moe hit Anderson a couple of times. At one point, the defendant stepped back while Freeman was still "tussling" with Anderson. The defendant pulled out his firearm out and told Anderson "stop your tripping." The defendant then hit Anderson multiple times with his gun in an attempt to get Anderson's gun away from him. After hitting Anderson, the defendant backed away. The defendant testified that he "pointed the gun and kept telling him to stop and he wouldn't so I just pulled the trigger one time."

¶ 27    The defendant stated that he did not want to shoot Anderson. The defendant also testified that he had feared for his safety and the safety of the other people involved. He denied that the group had attempted to rob Anderson.

¶ 28    After the defendant shot Anderson, he ran. The defendant explained that he ran because he did not know what to do; he was not allowed to have a firearm; and he was not allowed on the Fair Oaks housing complex property. The defendant changed clothes in the apartment located at 911 Fowler Street and also placed his gun in a garbage can inside the apartment. The defendant also testified that Freeman took Anderson's firearm after Anderson was shot. The magazine found on Anderson must have been an additional magazine because Anderson's gun was loaded.

¶ 29    On cross-examination, the defendant acknowledged that he was wearing the white NASA hoodie on April 24, 2019. The State went through the videos of April 24, 2019, with the defendant. The defendant acknowledged that the videos depicted him at the Fair Oaks housing complex

9

property prior to the incident. The defendant explained that he would "peek" around corners to check for the police and stand where he would not be seen because he was not allowed on the property. He further explained that he went to 911 Fowler Street before the shooting to "pick up some weed."

¶ 30    The defendant testified that when Freeman first confronted Anderson, Freeman was trying to sell Anderson some marijuana. The video depicted Anderson walking by Freeman, and Anderson kept walking while Freeman followed Anderson. The defendant testified that there were no visible guns at that point. The defendant had been watching Freeman and Anderson, and as he was watching the two men, the defendant started talking to Micah Hatcher ("Moe") and Mitchell. After Freeman screamed "help," the defendant ran to help Freeman. The defendant testified that Anderson tried to pull out his gun and had his hand on a gun while he was "tussling" with Freeman. The defendant claimed that he had intervened and had reached for Anderson's gun. He further testified he was scared. After the defendant testified, the defense did not call any additional witnesses and rested.

¶ 31    After closing arguments and jury deliberations, the jury found the defendant guilty of first degree murder Type A,[1] first degree murder Type B,[2] and unlawful use of a weapon by a felon. The jury also found that during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused the death of Anderson.

---

[1]A person commits the offense of first degree murder (Type A) when he kills an individual, without lawful justification, if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual; or he knows that such acts will cause death to that individual; or he knows that such acts create a strong probability of death or great bodily harm to the individual.
[2]A person commits the offense of first degree murder (Type B) when he kills an individual if, in performing the acts which cause the death, he is committing the offense of mob action and/or robbery.

10

¶ 32    On November 3, 2022, the defendant filed a *pro se* motion for ineffective assistance of counsel and requested a *Krankel*[3] hearing. The defendant raised multiple issues which included the claim that defense counsel was ineffective due to his failure to subpoena multiple key witnesses; defense counsel failed to cross-examine and impeach Driver for prior inconsistent statements regarding Anderson's firearm; defense counsel had failed to inform the court that a juror had fallen asleep and had to be awakened by the bailiff; and defense counsel failed to prevent a juror who had suffered trauma due to the death of her daughter from serving as foreman. The defendant subsequently supplemented his motion with reports and statements.

¶ 33    The circuit court held a *Krankel* hearing on January 9, 2023. The circuit court addressed each allegation in the defendant's motion and requested that the defendant expound further on his claims. As the defendant explained the numerous bases for his motion, defense counsel responded to each claim as it was addressed.

¶ 34    Specifically, the defendant asserted that defense counsel was ineffective because he failed to call or subpoena Tavaras Mitchell, Percy Freeman, Tariq Wilson, Micah Hatcher, Maleek Terry, Antwon Conner, Terry Copening, and Alexis King. The defendant argued that Mitchell had been acquitted of the charges related to the shooting incident, and Mitchell would have been able to testify to the events that occurred on April 24, 2019. The defendant also claimed that Freeman, Hatcher, and Terry would have been able to provide testimony consistent with the defendant's testimony. Wilson provided an affidavit and stated that he was never contacted by defense counsel. Terry and Conner would have testified that Anderson was upset on April 24, 2019, and Conner had informed the investigators that Anderson had a firearm. The defendant additionally argued that King was the driver of the gray Pontiac G6 that had pulled into the parking lot of Netta's

---

[3]*People v. Krankel*, 102 Ill. 2d 181 (1984).

11

convenience store. Her statement contradicted the State's claim that she had pointed towards Anderson's direction, prompting the group near the convenience store to disperse.

¶ 35    Defense counsel explained that he had spoken with Mitchell, reviewed his statements, and concluded that he would not be helpful at trial. Freeman had been convicted of the offense, provided multiple inconsistent statements, and he would have been impeached if he testified. Although the defendant stated that Wilson provided an affidavit that he had never been contacted by defense counsel, defense counsel testified that he had spoken to Wilson. Wilson did not want to speak with defense counsel and had no interest in testifying. Defense counsel testified that Hatcher had issues with his criminal background and would have invoked his fifth amendment rights, which would have prevented him from testifying. Terry had multiple pending felonies and defense counsel presumed that testimony regarding the victim's emotional state was not relevant. Defense counsel testified that he had considered having Terry testify based on his initial statement, but he provided a subsequent contradictory statement, and he had pending felonies as well. Also, the State would have presented evidence that Terry and the defendant had been in jail together for a time, suggesting that Terry had credibility issues. Similarly, Conner would not have added to the presentation of the defendant's case because the victim's emotional state was not relevant, and Anderson's firearm was visible on the video. Defense counsel also explained that he was aware of the statement made by King. However, she had a criminal history and would not have been a helpful witness based on her general demeanor.

¶ 36    The defendant also argued at the *Krankel* hearing that defense counsel should have cross-examined Driver, the victim's girlfriend, regarding her testimony that the victim did not have any weapons. Defense counsel did not recall Driver testifying that Anderson did not have a weapon.

12

Additionally, the video depicted Anderson with a weapon and Driver's statement regarding whether or not Anderson had a weapon was not relevant.

¶ 37    The defendant then addressed his claim that a juror had fallen asleep during trial and the bailiff had to wake the juror. The defendant stated that defense counsel was aware of the sleeping juror and had not brought this to the attention of the circuit court. Defense counsel responded that he was aware that a juror periodically would close his eyes during the trial, but the juror was not sleeping. He believed that the juror was paying attention and did not believe that the juror had acted inappropriately. During the preliminary *Krankel* hearing, the circuit court also indicated that it did not recall an issue with a juror sleeping or the bailiff waking a juror.

¶ 38    The defendant additionally argued that he had wanted to strike Konieczki, who had been selected as the foreperson of the jury, because she had lost her daughter six months prior to the trial. The defendant did not feel comfortable with Konieczki on the jury. Defense counsel responded that the defendant had indicated that he did not want Konieczki as a juror. Defense counsel explained that he had raised a motion to strike the juror for cause and had requested an additional peremptory strike. The motions were denied. Defense counsel additionally noted that he did not have control over the selection of the foreperson.

¶ 39    The circuit court found that the decision to call witnesses and whether to object at certain times throughout the trial were matters of trial strategy. The circuit court observed defense counsel during the trial and was not aware of anything done by defense counsel that was inappropriate or prejudicial. Based on the defendant's motion and the explanations argued by the defendant, the circuit court found that there was no neglect of the case by defense counsel. The circuit court denied the request for a new attorney and denied the defendant's claims regarding ineffective

13

assistance of counsel on the merits. The circuit court then addressed a motion for a new trial and denied that motion.

¶ 40    At sentencing, the circuit court found that counts I through V merged into count I. The defendant was sentenced to 80 years in the IDOC followed by 3 years' MSR on the first degree murder with intent conviction. The defendant was additionally sentenced to a consecutive five-year sentence on the unlawful possession of a weapon by a felon conviction. This appeal followed.

¶ 41                                   II. ANALYSIS

¶ 42    On appeal, the defendant argues that the circuit court erred in rejecting his *pro se* claims of ineffective assistance of counsel after conducting a preliminary *Krankel* inquiry. The defendant seeks to reverse the dismissal of his *pro se* claims, and remand for further *Krankel* proceedings with the appointment of new counsel for those proceedings. The defendant additionally argues that the circuit court erred in not striking a juror for cause or granting an additional peremptory strike.

¶ 43    Criminal defendants have a constitutional right to effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15. Claims of ineffective assistance of counsel are governed by a two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to establish a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44.

¶ 44    "A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed by this court in *People v. Krankel*, 102 Ill. 2d 181 (1984), and refined by its progeny." *People v. Roddis*, 2020 IL 124352, ¶ 34. The circuit court should first examine the factual basis of the claim when a defendant makes a claim of ineffective assistance of counsel. *Roddis*, 2020 IL 124352, ¶ 35. If the circuit court determines that the basis of the claim is

14

a matter of trial strategy or if the claim lacks merit, then the motion may be denied. *Roddis*, 2020 IL 124352, ¶ 35. The circuit court is not required to automatically appoint new counsel when a defendant raises ineffective assistance of counsel claims. *People v. Ayres*, 2017 IL 120071, ¶ 11. New counsel, however, should be appointed if the allegations show possible neglect of the case. *Roddis*, 2020 IL 124352, ¶ 35.

¶ 45     "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). An adequate *Krankel* preliminary inquiry involves

> "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. [Citations.] A brief discussion between the trial court and the defendant may be sufficient." *Moore*, 207 Ill. 2d at 78.

Additionally, when considering the defendant's *pro se* allegations of ineffective assistance, the circuit court can base its evaluation on the insufficiency of the defendant's allegations on their face and the circuit court's knowledge of defense counsel's performance at trial. *Moore*, 207 Ill. 2d at 79.

¶ 46     "A claim is meritless if it does not fall within the definition of ineffective assistance of counsel as provided in *Strickland*." *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 41. However, the circuit court should not dismiss claims "on the bare fact that it may relate to trial strategy" because a defendant may be able to overcome the strong presumption of trial strategy. *Lawson*, 2019 IL App (4th) 180452, ¶ 42. The circuit court must determine if the allegations and factual bases could support a claim that defense counsel was objectively unreasonable when considering matters of trial strategy. *Lawson*, 2019 IL App (4th) 180452, ¶ 42.

15

¶ 47    The standard of review depends on whether the circuit court determined the merits of the posttrial *pro se* claims of ineffective assistance of counsel. *People v. Jackson*, 2020 IL 124112, ¶ 98. The legal question of whether the circuit court properly conducted a *Krankel* preliminary inquiry is reviewed *de novo*. *Jackson*, 2020 IL 124112, ¶ 98. Where the circuit court properly conducted an inquiry, we will reverse only if the determination on the merits of the defendant's *Krankel* motion was manifestly erroneous. *Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Jackson*, 2020 IL 124112, ¶ 98.

¶ 48    The defendant argues that the circuit court erred in rejecting his *pro se* claims of ineffective assistance of counsel where defense counsel failed to present testimony of corroborating witnesses; failed to adequately cross-examine a State's witness; and failed to alert the circuit court regarding a sleeping juror. During the preliminary *Krankel* inquiry, the circuit court reviewed each of the defendant's *pro se* allegations individually. For each claim, the defendant was given the opportunity to explain his allegation and defense counsel provided a direct response. Therefore, the record demonstrates that the circuit court properly conducted the *Krankel* inquiry.

¶ 49    The defendant had the opportunity to explain and expound upon his allegations as to why he believed defense counsel was ineffective for failing to present eight witnesses who would have supported the defendant's claim of self-defense. Specifically, the defendant claimed that Mitchell, Freeman, Hatcher, and Copening would have been able to provide testimony consistent with the defendant's testimony; that defense counsel never contacted Wilson; Terry and Connor, who would have testified to Anderson's emotional state on the date of the incident; Connor additionally would have testified that Anderson had a firearm; and King's testimony would have contradicted the State's theory of the case.

16

¶ 50    In response, defense counsel explained that he had spoken with the witnesses, reviewed witness interviews and criminal histories, and understood that certain witnesses could be impeached and would have credibility problems. Defense counsel provided a specific and strategic reason for not calling each of the witnesses identified by the defendant. Additionally, defense counsel offered a reason that the particular witness would not have offered testimony consistent with the defendant's theory of self-defense and the defense of others or would have had credibility issues.

¶ 51    Defense counsel's decision on whether to call certain witnesses is generally a matter of trial strategy. *People v. Banks*, 237 Ill. 2d 154, 215 (2010). Defense counsel's explanations revealed that he had considered the credibility of each witness and weighed the value of whether to call the witness and whether the witness would have aided the defendant's defense. Therefore, we find that defense counsel's decisions regarding these witnesses were a matter of trial strategy in this case, as found by the circuit court.

¶ 52    We also consider whether the defendant was prejudiced by defense counsel's failure to call any of the eight witnesses identified by the defendant. The Fair Oaks housing complex surveillance system captured what transpired on April 24, 2019, and the video evidence was presented to the jury. The video showed that the defendant and others appeared to attack Anderson. The State also presented a witness, Schroeder, who was able to see and hear what had occurred. According to Schroeder, Anderson said "no" repeatedly and Schroeder never saw Anderson hit anyone or extend his arms in a threatening way. Schroeder's testimony was consistent with the video evidence. The defendant was not prejudiced by defense counsel's decision to refrain from presenting any of the multiple witnesses identified by the defendant and the circuit court's denial of the defendant's

17

claim of ineffective assistance of counsel for failing to call these witnesses was not manifestly erroneous.

¶ 53    The defendant additionally argued that defense counsel was ineffective for failing to cross-examine Driver and impeach her statement that Anderson did not have a gun. However, the record does not reflect that Driver testified that Anderson did not have a gun. Rather, Driver was asked if she had knowledge of whether Anderson owned a gun or had a gun when he left the house on April 24, 2019. Driver responded "no," and the State clarified that she did not know if Anderson had a gun. During the *Krankel* inquiry, defense counsel also explained that Driver's knowledge of whether Anderson had a gun was not relevant because the video depicted Anderson with a gun.

¶ 54    The decision of whether or not to cross-examine or impeach a witness is also considered a matter of trial strategy. *People v. Smith*, 177 Ill. 2d 53, 92 (1997). Here, defense counsel's decision to not cross-examine the victim's girlfriend, who was not present for the incident, and had testified that she did not have knowledge of whether Anderson had a gun, was sound trial strategy. The defendant had not demonstrated that he was prejudiced by defense counsel's decision to refrain from cross-examining Driver where the record demonstrated that Driver was not aware if Anderson had a gun. The circuit court's denial of the defendant's claim of ineffective assistance of counsel for failing to cross-examine Driver was not manifestly erroneous.

¶ 55    The defendant also alleged that defense counsel was negligent for failing to address the issue of a juror sleeping during trial. "Both the federal (U.S. Const. Amends. VI, XIV) and state constitutions (Ill. Const. 1970, art. I, § 8) guarantee a criminal defendant the right to a trial by an impartial jury." *People v. Wilson*, 303 Ill. App. 3d 1035, 1041 (1999). A violation of the defendant's right to a trial by an impartial tribunal requires reversal. *People v. Cole*, 54 Ill. 2d 401, 411 (1973). The right to a jury trial guarantees a defendant a fair trial by a panel of impartial jurors.

*Cole*, 54 Ill. 2d at 411. "The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Cole*, 54 Ill. 2d at 411.

¶ 56    A juror is unqualified to serve on the jury where the juror is inattentive for a substantial portion of a trial. *People v. Jones*, 369 Ill. App. 3d 452, 455 (2006) A juror who is asleep for "much of the trial" is unable to perform the duty of a juror. *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972).

¶ 57    Here, the defendant did not establish that a juror was sleeping or inattentive for a substantial portion of the trial. Defense counsel was aware of the juror in question and explained that the juror would occasionally close his eyes, but did not appear to be asleep. Defense counsel had the impression that the juror was paying attention and participating appropriately. Furthermore, the circuit court did not recall that a juror had fallen asleep during trial and had no recollection of a bailiff waking a juror. The circuit court can base its evaluation on its own knowledge of defense counsel's performance at trial. *Moore*, 207 Ill. 2d at 79. The circuit court's denial of this claim was not manifestly erroneous where the circuit court had not noticed a sleeping juror and defense counsel recalled that the juror in question was paying attention.

¶ 58    We next turn to the defendant's claim that the circuit court erred in not striking a juror for cause or granting an additional peremptory strike. As previously discussed, a criminal defendant is guaranteed the right to a jury trial by an impartial jury. *Wilson*, 303 Ill. App. 3d at 1041. The purpose of *voir dire* examination is to select a jury that is free from bias or prejudice. *People v. Encalado*, 2018 IL 122059, ¶ 25. The manner and scope of a *voir dire* examination rests within the discretion of the circuit court as there is no precise test for determining questions which will reveal impartial jurors. *People v. Rinehart*, 2012 IL 111719, ¶ 16. The circuit court has discretion to grant additional peremptory challenges to ensure a fair trial. *People v. Chevalier*, 159 Ill. App.

3d 341, 348 (1987). As such, we review a claim that the circuit court's actions prevented the selection of an impartial jury under an abuse of discretion standard. *People v. Short*, 2014 IL App (1st) 121262, ¶ 78.

¶ 59 " 'The determination of whether a prospective juror is biased is within the sound discretion of the trial judge whose decision will not be reversed unless it is against the manifest weight of the evidence.' " *People v. Bowman*, 325 Ill. App. 3d 411, 422 (2001) (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097 (2001)). A finding of bias "must be made from the evidence" and "[m]ere suspicion of bias is not evidence." (Internal quotation marks omitted.) *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 46. The party challenging a juror bears the burden of showing that the juror is biased. *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 48 (1993).

¶ 60 The defendant argues that Konieczki's ability to be a fair and impartial juror was compromised because her daughter had recently passed away. Konieczki was asked whether it would be too difficult for her to be a member of the jury. She responded, "I honestly don't know. I mean grief is awful, but like today I'm okay." Her response did not indicate that she was biased. Rather, the grief of losing her daughter could potentially affect her, but at that moment, she believed she was capable to serve on the jury.

¶ 61 The defendant additionally argues that Konieczki was never specifically asked whether the death of her daughter would affect her. However, it was the defendant's burden to show that a juror is biased. The defendant did not inquire regarding the circumstance of the death, such as whether Konieczki's daughter was a victim of a crime. While defense counsel argued that Konieczki's statements were concerning, defense counsel also acknowledged that Konieczki had indicated that she was "okay" during *voir dire*. Moreover, the circuit court had inquired of all the potential jurors whether there was any issue regarding the nature of the charges that would prevent

20

the individuals from being fair and impartial. The defendant's suspicion that Konieczki possibly would not be fair or impartial as the trial progressed was insufficient to demonstrate bias. Konieczki had been selected as the foreperson of the jury and the record did not demonstrate that she had any issues with grief during the trial. The circuit court's refusal to excuse Konieczki for cause was not against the manifest weight of the evidence.

¶ 62　　Finally, the defendant argues that the circuit court erred by failing to grant him one additional peremptory challenge. Here, the decision regarding whether to grant an additional challenge rests within the sound discretion of the circuit court. See *Chevalier*, 159 Ill. App. 3d at 348. We find no abuse of discretion here.

¶ 63　　In summary, we find that the factual bases argued by the defendant for each of his claims did not demonstrate that defense counsel's trial strategy was objectively unreasonable or that the defendant was prejudiced. We further find that the circuit court did not err in its determination regarding the juror the defendant alleged was sleeping or in its decision not to remove Konieczki. The circuit court's denial of the defendant's claims of ineffective assistance of counsel during the preliminary *Krankel* hearing was not manifestly erroneous.

¶ 64　　　　　　　　　　　　　　III. CONCLUSION

¶ 65　　For the foregoing reasons, we affirm the judgment of Vermilion County.

¶ 66　　Affirmed.